## MASTER AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATIONS

I, James M. Staton, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I am employed as a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations office (DHS ICE HSI) in Boston, Massachusetts. I have been a Special Agent with DHS ICE HSI since July 2011. I graduated from the Federal Law Enforcement Training Center in Brunswick, Georgia in January of 2012, where I received specialized training including, but not limited to, investigating violations of federal law relating to narcotics, as well as training in drug smuggling, drug identification, immigration law, child exploitation, defensive tactics, firearms, and criminal law. Prior to my employment as a Special Agent with Homeland Security Investigations, I was employed as Border Patrol Agent with the Department of Homeland Security from July of 2007 through July of 2011. I graduated from Clemson University in South Carolina, with a Bachelor of Science in Business Management, and received a master's degree from the University of Arizona in International Security Studies.  During my tenure as a Special Agent, I have conducted numerous types of investigations including human smuggling, immigration violations, narcotics and related money laundering.  During the investigation of these cases, I have participated in the execution of search and arrest warrants.

2.     Together with other Special Agents and investigators from DHS ICE HSI, the United States Department of Labor, Office of Inspector General, Office of Investigations (DOL OIG OI), and the Internal Revenue Service, Criminal Investigation, I am currently investigating

several individuals, including CHELBE WILLAMS MORAES ("**CHELBE**"); CHELBE's brother, JESSE JAMES MORAES ("**JESSE**"); **JESSE**'s son and **CHELBE**'s nephew, HUGO GIOVANNI MORAES ("**HUGO**"); **CHELBE**'s daughters CAROLINE DE MORAES PARLEE ("**CAROLINE**") and JANAINA DE MORAES GUALBERTO ("**JANAINA**"); **TONY ANGEL CHACON-GIL a/k/a "MARQUITO" a/k/a "MARCOS CHACON" ("CHACON" or "MARQUITO")** and others (collectively, the "Target Subjects"), for violations of: Title 8, United States Code, Sections 1324(a)(1)(A)(i) and (B)(1) (knowing that a person is an alien, bringing to or attempting to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien); 1324(a)(1)(A)(iv) and (B)(1) (encouraging and inducing an alien to come to, enter, and reside in the United States for commercial advantage or private gain, knowing and in reckless disregard of the fact that such coming to, entry, and residence is or will be in violation of law); 1324(a)(1)(A)(v)(I) and (B)(i) (conspiracy to commit and aiding and abetting the previous acts); and 1324(a)(3)(A) (during any 12-month period, knowingly hiring for employment at least 10 individuals with actual knowledge that the individuals are aliens who are unauthorized and have been brought to the United States in violation of this subsection); and Title 18, United States Code, Sections 1956(a)(1)(B)(i) (concealment money laundering); 1956(a)(2)(A) (international promotion money laundering); 1956(h) (money laundering conspiracy); and 1028(a)(2) (knowing transfer of a false identification document knowing that such document was produced without lawful authority); among other offenses  (the "Target Offenses").

3.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for warrants to search:

- the premises known as **TASTE OF BRAZIL—TUDO NA BRASA, LLC**, 414 Main Street, Woburn, Massachusetts ("**TASTE OF BRAZIL**" or "**TUDO NA BRASA**"), as more specifically described in Attachment A-1, which is incorporated by reference;

- the premises known as **THE DOG HOUSE BAR & GRILL, LLC**, 434 Main Street, Woburn, MA ("**THE DOG HOUSE**" and, together with **TASTE OF BRAZIL**, "**THE RESTAURANTS**"), as more specifically described in Attachment A-2, which is incorporated by reference;

- **JESSE**'s person and any bags or items in his custody or control, including his cellular telephone (number 781-879-0068), as more specifically described in Attachment A-3,

- which is incorporated by reference;

- **HUGO**'s person and any bags or items in his custody or control, including his cellular telephone (number 781-858-4830), as more specifically described in Attachment A-4, which is incorporated by reference;

- **CAROLINE**'s person and any bags or items in her custody or control, including her cellular telephone (number 781-608-5201), as more specifically described in Attachment A-5, which is incorporated by reference;

- **JANAINA**'s person and any bags or items in her custody or control, including her cellular telephone (number 781-640-3632), as more specifically described in Attachment A-6, which is incorporated by reference;

4.    Based on the facts set forth in this affidavit, there is probable cause to believe that evidence of the commission of the Target Offenses will be located at **THE RESTAURANTS** and on the persons of **JESSE, HUGO, CAROLINE, and JANAINA**.

5.    I am a Special Agent and have conducted this investigation working closely with other Special Agents and law enforcement personnel.  The facts in this affidavit come from my personal observations and review of records, my training and experience as an HSI Special Agent, and information obtained from other law enforcement personnel and witnesses. Since this affidavit is being submitted for the limited purpose of securing search warrants, I have not included every fact known concerning this investigation. I have only set forth the facts necessary to establish probable cause that the Target Individuals have committed one or more of the Target Offenses, and that evidence, fruits, and instrumentalities of the Target Offenses are presently located on and within the premises and persons to be searched.

## PROBABLE CAUSE

### Overview of the Investigation and Targets

6.     This investigation has shown that **CHELBE**, and at times **JESSE**, recruits individuals in Brazil who wish to be smuggled into the United States.  For a substantial fee, **CHELBE** arranges for them to travel to the United States through Mexico and enter the United States, usually at a point other than an authorized port of entry.  **CHELBE** sometimes encourages the migrants to make false claims that unrelated migrants are part of the same family unit and to make false applications for asylum.  He also gives them fake contact information for individuals who pose as the U.S. point of contact for the migrants.  In some cases, **CHELBE** gives, or offers to give, the migrants false documentation to support their claims.  Once the migrants are in the United States, **CHELBE** uses relatives and friends in the United States to collect the smuggling debt and to provide the migrants with employment and immigration representation.  While **CHELBE** has sent migrants to different parts of the United States, he has sent many to Massachusetts, where his main co-conspirators are **JESSE**, **HUGO**, **CAROLINE** and **JANAINA**.

7.     Among other things, **JESSE** and **HUGO:** employ the migrants in **THE RESTAURANTS** and advise them and their families about other jobs; pay the migrants, at least partly in cash, usually well below the minimum wage, and often withholding all or part of the migrants' pay and applying that money to the migrants' smuggling debt or their rent; find them a residence and loan them money for rent and utilities; collect or assist in the collection of the migrants' smuggling debt payments, including encouraging them to pay their smuggling debt and at times issuing explicit or veiled threats about the consequences of nonpayment; and provide general advice to the migrants about residing in the United States.

8.     Among other things, **CAROLINE** and **JANAINA:** collect and assist in the collection of the migrants' smuggling debt payments and wire money to **CHELBE** and to migrants and others to facilitate the smuggling operation.

9.     **CHACON** sells false identification documents, including Social Security cards and Permanent Resident cards ("Green Cards"), to migrants smuggled in by members of the conspiracy to facilitate their work without authorization.

### Indictment of CHELBE

10.    On June 1, 2021, a United States grand jury sitting in this district returned a sealed four-count indictment against CHELBE charging him: in Count One with conspiracy to encourage and induce an alien to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence is or will be in violation of law, and doing so for commercial advantage or private gain, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I) and (B)(i); in Count Two with  encouraging and inducing an alien to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence is or will be in violation of law, and doing so for commercial advantage or private gain, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv) and (B)(1); in Count Three with conspiracy to commit international promotion money laundering and concealment money laundering, in violation of Title 18, United States Code, Section 1956(h); and in Count Four with international promotion money laundering in violation of Title 18, United States Code, Section 1956(a)(2)(A).  United States v. Chelbe W. Moraes, Criminal Number 1:21-cr-10175-ADB.  CHELBE has not been arrested on this indictment.  He is a citizen of Brazil and, according to law enforcement sources in Brazil, has been living in Brazil since this indictment was

returned.  I have been informed that Brazil will not extradite a Brazilian citizen to face these charges.

**The Operation of the Smuggling Organization**

11.     Multiple sources that have been smuggled into the United States from Brazil[1] by **CHELBE**'s organization have provided information and evidence about the operation of the smuggling organization and communications with the targets.  Their information/evidence along with other evidence developed in this investigation are described below.

> *a.*  "SOI" is a source of information who, with a spouse and two children, was smuggled into the United States from Brazil by **CHELBE** and other Target Subjects in 2018.  SOI's information is discussed starting at paragraph 10 of this affidavit.

> *b.*  "CW-1" is an individual who was smuggled into the United States from Brazil by **CHELBE** and other Target Subjects in 2019.  CW-1's information is discussed starting at paragraph 13 of this affidavit.

> c.  "SOI-2" is CW-1's relative.  Like CW-1, SOI-2 was smuggled into the United States from Brazil (in a separate trip) by **CHELBE** and other Target Subjects in 2019.  SOI-2's information is discussed starting at paragraph 19 of this affidavit.

---

[1] Each migrant described below lacked a visa or any other lawful means of entering the United States at the time they entered the United States.

d.  "CW-2" is an individual who was smuggled into the United States from Brazil, with two of CW-2's children, by **CHELBE** and other Target Subjects in 2018. CW-2's information is discussed starting at paragraph 24 of this affidavit.

e.  "SOI-1" is CW-2's relative.  Like CW-2, SOI-1 was smuggled into the United States from Brazil by **CHELBE** and other Target Subjects in 2018.  SOI-1's information is discussed starting at paragraph 43 of this affidavit.

f.  "Individual 5" and "Individual 6" are individuals who were smuggled into the United States from Brazil, at the same time as CW-2, by **CHELBE** and other Target Subjects.  Information about these individuals is discussed starting at paragraph 20 of this affidavit.

g.  "Individual 7" is a former employee of **TASTE OF BRAZIL** who entered the United States illegally in 2016.  Information about this individual is discussed starting at paragraph 35 of this affidavit.

h.  Individuals 1-3 are individuals who were smuggled into the United States from Brazil by **CHELBE** and other Target Subjects.  Information about these individuals is discussed starting at paragraph 32 of this affidavit.

i.  "SOI-3" is a relative of Individual 2.  SOI-3 was smuggled into the United States from Brazil in 2021 by **CHELBE** and other Target Subjects.  SOI-3's information is discussed starting at paragraph 48 of this affidavit.

### *Smuggling of SOI and Family*

12.     A source of information ("SOI") advised investigators that SOI and SOI's spouse ("SOI's spouse") along with two children, were smuggled into the United States from Brazil in 2018 by **CHELBE** and members of his family for a total fee of approximately $32,000.  SOI said a co-worker of SOI's spouse in Brazil put them in touch with **CHELBE** about travel to the United States. **CHELBE** then traveled to their home in Brazil to discuss the process and to sign a contract once an agreement was made.  SOI later stated that anyone in Brazil who wants to go to the United States knows to contact **CHELBE**.  SOI said that to make the trip sound more appealing and legitimate, **CHELBE** told SOI his brother owned a restaurant in the United States that SOI could work at, and his brother would travel to Brazil to meet with them and prove to them the restaurant existed.  SOI said that **CHELBE**'s brother **JESSE** flew to Brazil and met with SOI and **CHELBE** at their house when they discussed the details of their smuggling trip.  SOI stated **CHELBE**'s brother was the owner of **TUDO NA BRASA** and was aware of "everything going on."

13.     SOI described **CHELBE** as "the boss" or "jefe" and said he had people in Mexico working for him.  SOI said that SOI and SOI's spouse were responsible for the $24,000 fee to smuggle them and their daughter into the United States and that the mother of SOI's spouse's son was to pay the remaining $8,000.  SOI said they paid approximately half of the smuggling fee up front and were required to pay the balance in monthly installments of approximately $1,450 beginning six months after reaching the United States.  SOI said they signed a contract, or promissory note, with **CHELBE** in Brazil agreeing to these terms.

14.     SOI stated that SOI, SOI's spouse, SOI's daughter, and SOI's spouse's son left Brazil together and headed for Mexico City.  SOI stated that a man in Mexico received instructions from **CHELBE** to have the family split up into two groups of two to cross into the United States.

SOI said **CHELBE** instructed SOI to lie to immigration authorities at the border and say SOI was not married and that SOI did not know where SOI's spouse was at the time of SOI's apprehension.

15.    SOI stated that **CHELBE** instructed SOI to provide the name "Karine Rocha" to U.S. immigration authorities as SOI's U.S. point of contact and say Karine was SOI's friend, even though SOI did not know "Karine."  **CHELBE** told SOI to tell U.S. immigration authorities that if SOI was allowed to enter the United States, SOI would be staying with their friend in Warminster, PA. Once SOI was in the United States, they[2] contacted "Karine" at a phone number **CHELBE** gave them.  "Karine" referred SOI to someone named Julio who SOI said was an attorney in Woburn, Massachusetts.  Based on information uncovered during this investigation, it is believed that this was Julio Morais, who is a nephew of **CHELBE**'s.  He does not appear to be an attorney but has represented migrants smuggled by **CHELBE** at immigration interviews and other proceedings.  Julio told SOI that they could stay at 37 Center Street in Woburn.  SOI stated anyone who used **CHELBE**'s services, who worked at **TUDO NA BRASA**, lived at 37 Center Street when they first got to the United States.

16.    According to records of the City of Woburn Assessor's Database, 37 Center Street has been owned since 2008 by John Holland.  John Holland is the uncle of **HUGO**'s wife, Kristen Moraes.  I believe, based on my training and experience and work on this investigation, based on **HUGO**'s family member's ownership of 37 Center Street, and based on other facts discussed in

---

[2] Unnamed sources are referred to in this affidavit with third person plural pronouns to avoid disclosing their gender.

this affidavit, that **HUGO** arranged, directly or indirectly, for migrants who have been smuggled into the United States to stay at 37 Center Street.

17.     SOI stated that while they were in Texas, Julio and "Karine" instructed them not to go to the Warminster, PA address but to go to 37 Center Street in Woburn. According to SOI, **CHELBE**/Karine paid for SOI's Southwest Airlines flight from Texas to Massachusetts.

18.     Upon arriving in the United States, SOI stated that they worked at **TUDO NA BRASA** for approximately one month.  SOI told investigators the work was very hard.  SOI was required to carry heavy sacks of potatoes and other heavy items.  SOI stated they were paid $3.00 per hour, did not receive any tips, and worked 7:00 am to 9:00 pm.  SOI stated they told **JESSE** and **HUGO** (who co-owned and co-managed **TUDO NA BRASA**) that SOI was not able to lift such heavy items and could no longer work at **TUDO NA BRASA**, to which they told SOI "You're out, and out of 37 Center Street."  SOI stated **JESSE** and **HUGO** brought SOI to the basement of **TUDO NA BRASA** and yelled at SOI.  They told SOI they wanted SOI to work at the restaurant, but if SOI did not, SOI could not stay at the Center Street apartment. SOI stated **JESSE** told SOI that if SOI did not cooperate, they would call Immigration and have them deported. SOI explained **HUGO** is **JESSE**'s son.  SOI stated "they" used the second floor of the Center Street apartment to house their employees and that if you did not work at **TUDO NA BRASA** you could not live there. SOI stated at one point both SOI and SOI's spouse worked at **TUDO NA BRASA** and never

received money for their work. SOI was told the work they did at the restaurant went toward their

monthly rent of $1,400 at Center Street.  SOI stated SOI had a zero balance for rent that month.[3]

### Smuggling of CW-1

19.     CW-1, an individual who began cooperating with this investigation after unlawfully

entering the United States,[4] has provided detailed information as follows about how **CHELBE**

arranged for CW-1 to travel from Brazil to the United States and to enter the United States

unlawfully. Specifically, in or about March 2019, CW-1 first contacted **CHELBE** in Brazil to

discuss their interest in being smuggled into the United States. CW-1 received **CHELBE**'s number

from a friend who had been smuggled into the United States. During this initial phone

conversation, **CHELBE** assured CW-1 passage into the United States, described the travel route,

and discussed his smuggling fee. **CHELBE** and CW-1 agreed upon a smuggling fee of $22,000,

which included payment for smuggling CW-1's family. CW-1 agreed to pay $10,000 in advance

and to pay **CHELBE** the remainder of the smuggling debt in 15 monthly payments of $800 after

entering the United States. **CHELBE**'s initial price was $20,000, but he added $2,000 in interest

after he agreed to accept payment in installments.

---

[3] Based on SOI's statements, SOI worked approximately 14 hours a day with no days off
for approximately one month. Based on this work at $3.00 per hour, SOI should have received a
check for approximately $1,260.

[4] CW-1 was born and raised in Brazil. CW-1 has no criminal record in the United States,
and I am unaware of any criminal record of CW-1 in Brazil. CW-1 has been informed by agents
that their cooperation in this investigation could result in permission to remain in the United States.
CW-1 has received Deferred Action and Employment Authorization from DHS as a result of CW-
1's cooperation in this investigation. HSI has paid $4,100 toward CW-1's debt to **CHELBE**.

20.     Before leaving Brazil, CW-1 met twice with **CHELBE**, once at CW-1's residence and once at a hotel. **CHELBE** told CW-1 he is a lawyer and the mayor of a city near Governador Valadares, in the state of Minas Gerais, Brazil. A family member of CW-1 living in Massachusetts agreed to pay **CHELBE** the $10,000 down payment for CW-1's smuggling trip. **CHELBE** instructed CW-1's family member to make the payment to **CHELBE**'s daughter, **CAROLINE**, who was living in Woburn, Massachusetts and messaged a photo of **CAROLINE** to CW-1's family member. In early April 2019, **CAROLINE** drove to CW-1's family member's house and collected the $10,000 smuggling payment

21.     CW-1 and their family began their smuggling trip by taking a bus from Belo Horizonte to Sao Paulo, Brazil. According to CW-1, **CHELBE** paid for the bus tickets. Prior to this, at **CHELBE**'s instruction, CW-1 texted **CHELBE** a photo of CW-1 with their family. In addition, **CHELBE** gave CW-1 a credit card that was to be used during the trip. Once CW-1 arrived in Sao Paulo, **CHELBE** arranged for CW-1 and their family to be picked up by **CHELBE**'s associates.

22.     The next day, CW-1 and their family flew from Sao Paulo, Brazil, to Cancun, Mexico. At **CHELBE**'s instruction, CW-1 took a taxi from the Cancun airport to a specified hotel in Cancun. According to CW-1, **CHELBE** booked and paid for their room. **CHELBE** provided CW-1 with a phone number of a Brazilian individual who worked for **CHELBE** and lived in Cancun. This individual gave CW-1 five hundred pesos. During CW-1's stay at the hotel in Cancun, at **CHELBE**'s instruction, CW-1 purchased a new SIM card for their phone so CW-1 could continue to communicate with **CHELBE**.

23.     A taxi driver who worked for **CHELBE** picked up CW-1 and their family at the hotel in Cancun and took them to the Cancun airport. From Cancun, they took a flight to Ciudad

Juarez, Mexico, which is on the Rio Grande River just south of El Paso, Texas. At **CHELBE**'s instruction, CW-1 took a taxi from the airport to a specified hotel in Ciudad Juarez. According to CW-1, the hotel was full, with many people waiting to cross illegally into the United States. A Brazilian individual affiliated with **CHELBE** met CW-1 at the hotel and asked who their smuggler was. CW-1 responded that they were with **CHELBE**. The Brazilian individual then brought CW-1 and their family to a room and said he would return to talk.

24.     While CW-1 was at the hotel in Ciudad Juarez, they received a message from **CHELBE** over WhatsApp. **CHELBE** instructed CW-1 to write down the contents of the message and give it to Immigration authorities in the United States when CW-1 was arrested. The message contained the name, address, and telephone number of a purported U.S. point of contact: Marcos Silva, 17 Gladstone St., #12, Everett, MA 02149, 781-451-7505.[5]  CW-1 did not know such an individual and had no intention of ever going to this address.

25.     At approximately 7:30 p.m., an individual went room by room and told the hotel occupants to go to the hotel lobby. CW-1 and their family, along with approximately 30 to 40 other people, were placed in four vans and driven to the United States border at a place other than an official Port of Entry. The van drivers appeared to be Mexican and communicated with one another by portable radios. CW-1 and their family walked through the Rio Grande River where the water level was low and were apprehended by U.S. Border Patrol agents shortly after crossing the border.

---

[5] See sections below on *The Use of the YMAX Accounts to Provide Fake U.S. Contact Information* and *Additional Information About Involvement of **CAROLINE** and **JANAINA***.

26.     After CW-1's arrest in the United States, Immigration authorities placed CW-1 and their family in a shelter. CW-1 contacted **CHELBE** from the shelter, and **CHELBE** instructed CW-1 to go to a motel upon their release. CW-1 paid for the motel room using the credit card **CHELBE** had given to them.  **CHELBE** was to purchase plane tickets for CW-1 and their family from El Paso, Texas to Boston, but delayed doing so due to high prices. According to CW-1, ultimately, **CAROLINE** wired the money from Massachusetts to Texas for the plane tickets. CW-1 and their family then traveled by plane from El Paso to Boston.

27.     After CW-1 arrived in Massachusetts, **CHELBE** contacted a family member of CW-1's and gave CW-1's family member contact information for **CHELBE**'s brother **JESSE**. **CHELBE** told CW-1's family member that his brother owns a Brazilian restaurant in Woburn and that CW-1 should call **CHELBE**'s brother if CW-1 needed a job. I have confirmed that the phone number **CHELBE** provided, **(781) 879-0068**, is subscribed to and used by **CHELBE**'s brother, **JESSE**, who co-owns and operates **TASTE OF BRAZIL** restaurant in Woburn with his son, **HUGO**.

28.     Shortly after CW-1 arrived in Massachusetts, **CHELBE** sent CW-1 a WhatsApp text message with **CAROLINE**'s name and address and instructed CW-1 to make payments to her for CW-1's smuggling debt. **CHELBE** also told CW-1 to give **CAROLINE** the credit card that **CHELBE** gave CW-1 for the smuggling trip to the United States.

29.     On July 8, 2019, CW-1 sent **CAROLINE** a text message at her number **781-608-5201** saying, "I have the money for two installments for the trip I did with your father to come here to the USA. I wanted to know how can I deliver it."  CW-1 asked **CAROLINE** to give them the amount, and **CAROLINE** replied that "my dad was supposed to check the cost of the tickets [a]nd I will give it to you."  A few days later, CW-1 texted **CAROLINE**, "Good morning, did you

confirm the price for me? Because you got 10 thousand dollars from my [relative], so I told her that we have 12 thousand left. That it was 22 thousand the cost of the trip, but she is saying that it's 20 thousand the trip, that we are missing 10."  **CAROLINE** did not immediately respond to this text, but subsequently she offered to have CW-1 bring the payment to her house and ultimately directed CW-1 to pay $1,000 to her aunt, because she was not available that day.  I believe, based on my training and experience and work on this investigation, that this text exchange shows that **CAROLINE** knows that the money she was collecting was for smuggling debts owed to her father, because no legitimate trip from Brazil to the United States by CW-1 would cost $20-22,000.

30.     Once CW-1 began cooperating with HSI, CW-1 was shown a photo of **CHELBE** and identified him as the person CW-1 paid to smuggle them into the United States. CW-1 also identified **CHELBE**'s contact number as **+55 31 9727 3586**.  WhatsApp activity reveals that this number is used by **CHELBE**.

31.     Approximately 10 weeks after CW-1 arrived in the United States, CW-1 had a consensually recorded phone conversation with **CHELBE** under the supervision of an HSI Special Agent pursuant to this investigation. This conversation has been translated from Portuguese into English.[6] **CHELBE** was using a phone assigned number **+55 31 9727 3586** for this call. During this conversation, in which **CHELBE** identified himself as "Chelbe," **CHELBE** discussed obtaining documents for CW-1. **CHELBE** also told CW-1 that CW-1 must file a claim for humanitarian asylum "yesterday." **CHELBE** gave CW-1 the name of his nephew, Julio Morais,

---

[6] All communications between the targets of this investigation and cooperating individuals were in Portuguese, and all summaries and quotations from those communications in this affidavit are translations.

who **CHELBE** said could assist CW-1 with the asylum claim. **CHELBE** said, "[I]f he talks about documents that will be needed here from Brazil, this and that, then that's with me." **CHELBE** also told CW-1 that he would be sending the contact information for **CAROLINE**, who lives near CW-1, and said that she is the one who takes care of **CHELBE**'s business in the United States, while his wife takes care of his business in Brazil.

32.     On February 24, 2020, **CHELBE** sent two WhatsApp voice recordings to CW-1 asking them to wire $300 to a Brazilian named Adesio Geber De Figueiredo Junior ("Geber"). According to **CHELBE**, at the time, Geber was in Cancun and needed the money urgently for food and a hotel.   That afternoon, at agents' direction CW-1 sent $300 of official U.S. funds via MoneyGram to Geber in Cancun.  HSI has the receipt from the transaction.  On March 5, 2020, U.S. Customs and Border Protection agents arrested Geber after he entered the United States unlawfully about one mile west of the Paso Del Norte Port of Entry in El Paso, TX.  Geber gave agents a U.S. point of contact number of 781-451-7505, which is a YMAX phone number associated with **CHELBE**.[7]

33.     On July 31, 2020, CW-1 met with **JESSE** at **TASTE OF BRAZIL**. This meeting was audio and video recorded. CW-1 said they needed to make a payment to **CHELBE** but **CAROLINE** was not available to collect it.  **JESSE** told CW-1 that CW-1 could send it to **CHELBE** directly, but CW-1 said they did not know how to do that.  **JESSE** then walked with CW-1 to a Brazilian meat market in Woburn that processes electronic financial transactions and

---

[7] See sections below on *The Use of the YMAX Accounts to Provide Fake U.S. Contact Information* and *Additional Information About Involvement of **CAROLINE** and **JANAINA***.

gave CW-1 directions for wiring the $800 smuggling debt payment, which consisted of official U.S. funds, to **CHELBE** in Brazil.

34.     CW-1 continues to reside in the United States and has continued to make payments at agents' direction toward their smuggling debt to **CHELBE**.

### *Smuggling of SOI-2*

35.     A source of information ("SOI-2"), who is a relative of CW-1's, was also smuggled into the United States by **CHELBE**. On October 1, 2019, U.S. Border Patrol agents apprehended SOI-2 and their spouse and child after they illegally entered the United States approximately one mile east of the Paso del Norte Port of Entry in El Paso, Texas. SOI-2 and their family crossed the border with 16 other Brazilian nationals. According to SOI-2, the entire group was smuggled into the United States by **CHELBE**. SOI-2 provided the following information about their smuggling trip.

36.     SOI-2 stated that they contacted **CHELBE** after CW-1 was smuggled into the United States by **CHELBE**. SOI-2 sold their car and gave **CHELBE** the proceeds, along with an apartment owned by SOI-2's spouse, as a down payment for the smuggling trip. Once in Massachusetts, SOI-2 was expected to pay an additional $8,000 to **CHELBE** in 10 monthly installments of $800. **CHELBE** told SOI-2 to give the monthly payments to **CAROLINE** "in hand."

37.     Prior to leaving Brazil, **CHELBE** gave SOI-2 a fraudulent marriage certificate for two other migrants who would be traveling with SOI-2: Individual 5 and Individual 6. **CHELBE** instructed SOI-2 to give the fraudulent marriage certificate to Individual 5 at a hotel in Cancun,

Mexico.[8] **CHELBE**'s driver drove SOI-2 and their family to the airport in Belo Horizonte, Brazil, but they missed their departing flight. Eventually, SOI-2 and their group of migrants flew from Brazil to Cancun, Mexico via Peru. From Cancun, they flew to Ciudad Juarez, Mexico.

38.     At 10:34 am on October 3, 2019, **CHELBE** left a voice recording for SOI-2 over WhatsApp in which he said:

> Hey [SOI-2] [PH], now you don't miss a flight anymore, right [SOI-2]? [LAUGHS]
> I can tell that now… [LAUGHS] Now we have learned, haven't we? [LAUGHS]
> Now you will always arrive ahead of time. That's all right. You are going to have
> a nice trip, and everything is going to be okay. No problems. Going up there, the
> Federal knows that you guys are coming. They are not going to give you guys
> problems. If they do stop you, you can be sure that they will let you guys go. Okay?
> And when you guys reach the city of Juarez the Federal knows about you
> [LAUGHS] as well. It's all paid…they will not give you guys problems either. You
> guys will arrive, go down and go to the hotel and tonight, God willing, you all will
> be inside the United States. This is a direct flight. You guys are going direct to the
> border. It doesn't stop anywhere. Got it? It is a great flight. It's a special flight for
> you guys.

Based on my training and experience and work on this investigation, I believe **CHELBE** was referring to the fact that his organization had bribed Mexican Federal Police to allow SOI-2 and other migrants being smuggled by **CHELBE** to pass through Mexico to the United States border.

39.     The day after they missed the flight, **CHELBE** drove SOI-2 and their family to the airport himself. **CHELBE** was accompanied by two minor children. He told SOI-2 that he was getting the minors fake birth certificates to show they were brother and sister for a future smuggling trip.

---

[8] During an interview after being apprehended by U.S. Border Patrol agents, Individual 5 presented a marriage certificate to prove their marriage to Individual 6 was legitimate. Individual 5 told agents that Individual 6 was the biological parent of their minor child. DNA testing by CBP later determined that Individual 6 was not the biological parent of the minor child.

40.     SOI-2 and the rest of the migrants in their group flew together from Cancun to Ciudad Juarez. Upon arrival, the group was detained by Mexican Federal Police officers. The officers took a photo of SOI-2's group. While they were being held by the police, SOI-2 sent **CHELBE** a text via WhatsApp and informed him of the detention. **CHELBE** said not to worry and that he had already received the photo of the group taken by the police officers.

41.     After being released, the group took taxis to a hotel in Ciudad Juarez according to **CHELBE**'s instructions. While they were at the hotel, **CHELBE** sent WhatsApp messages to each family unit with the U.S. point of contact they were to give U.S. immigration authorities when arrested. After six hours at the hotel, SOI-2's group was driven to the U.S. border by unknown individuals who told them a direction in which to walk. They were apprehended by U.S. Border Patrol agents after they crossed the border.

42.     On October 6, 2019, **CHELBE** left a WhatsApp voice recording for CW-1 to give them an update on SOI-2's smuggling trip. In this recording, he said:

> Hey [CW-1], how are you? I spoke to [SOI-2]  Wednesday…early morning, between Tuesday and Wednesday, it was almost 1:00 AM. It was at the time they were getting into the immigration. Probably… no…[LAUGHS]…excuse me…I'm absolutely sure that they are at the immigration. What happens is that previously it wasn't taking much time at the immigration. Generally, it took around three  days, it was very quick. But the thing is, Brazilians, as usual, are always complicating things, uh…they have made lots of falsified documents at the immigration. And now they are taking DNA tests to verify if…later you do a search about it in the internet. You will find all the information, regarding DNA, DNA requirement for people crossing the border. And a DNA test isn't something that you do within two or three  minutes. It does take a little bit more time. Then, for this reason, it is taking longer…then people are…this started this week, by coincidence. Uh…until last week they weren't…they were doing only randomly, choosing one  or another to take the DNA test. Now, practically everybody has to take the DNA. Then, they will be taking one  week… then, I believe that tomorrow they will let them go, understand? By my…by my calculations. They got in on Tuesday. It is taking one week…Tuesday to Wednesday… then it will be between Monday and Tuesday. That is how long it is taking these days. Everybody that got in…for example, who got in on Saturday…last Saturday, was released the day before yesterday…the

night between Friday and Saturday. And there are lots of people…and it's delaying things, [REDACTED]. But you know it, at least, [SOI-2] is at the immigration, and we are relaxed because we know they aren't in any danger, right? They are poorly housed, we know that, unfortunately. When they are with us, we can provide comfortable accommodations and so on, but there, at the immigration, we can't do anything about it. This way, we are waiting…actually, it wasn't only your [relative]. You know, many people came in together, on the same day, right? Only my people were 16 persons. Probably your [relative] told you this, that the group was large. [SOI-2] was even helping me organize things related to the hotel, meals and other stuff. [SOI-2] was very helpful. I even joke with [them] that I would have to pay [them] instead of [them] paying me. [LAUGHS] But…then, it was a lot of people, not even one  has been released so far. Because the situation is the same for all. DNA test. So, we have to wait. But we know that the government can't hold these people there because of the children. They can't be held there for many days. So, I believe between today and tomorrow…tomorrow we may have news from [them], God willing. Stay calm, [CW-1], they are fine. You can rest assured they're fine.

43.    I believe, based on my training and experience and work on this case, that **CHELBE** was passing along information he received from SOI-2 about the situation at the United States/Mexico border for the migrants, including SOI-2, whose trip had been arranged by **CHELBE**. The information he gave to CW-1 about DNA testing was accurate, as the United States government had begun DNA testing of migrants to determine the veracity of claims that certain migrants were part of a family unit.

44.    Upon SOI-2's release from the El Paso detention facility, **CHELBE** provided SOI-2 a phone number for an unknown Brazilian male who drove SOI-2 and their family to the airport and paid for the airline tickets to Boston.

45.    On October 14, 2019, CW-1 had a consensually recorded phone conversation with **CHELBE** about SOI-2's smuggling trip. In this conversation, **CHELBE** said, "they were released yesterday, they are going home, and they are arriving tonight in Massachusetts, thank God." I believe, based on my training and experience and work on this case, that **CHELBE** was referring

to the migrants' release from United States custody after being arrested for entering the United States unlawfully. **CHELBE** continued:

> Tomorrow morning, they are leaving for Boston, because there were no flights; [BACKGROUND NOISE: DOOR SLAMMING] the flights are packed, because they are releasing many people, all the flights are packed; if you want to buy a ticket [LAUGHS SOFTLY] to Boston from El Paso, there are none. … Because all the flights are packed, actually I wasn't able to buy a ticket for a boy who was released; I needed six  tickets and I managed to buy four , uh and I found one  opening, but there was no way, because they were father and son, so I needed two  openings, then I had to buy it for tomorrow morning, he will leave tomorrow morning , because there were no openings, the flights are all packed; they are releasing everyone, so now the flights are all packed.

I believe, based on my training and experience and work on this investigation, that **CHELBE** was referring to the fact that, as part of his smuggling services, he buys plane tickets for his migrants to reach their final destination in the United States after they have entered the United States unlawfully.

### *Smuggling and Employment of CW-2*

46.     CW-2, an individual who began cooperating with this investigation after unlawfully entering the United States,[9] has provided the following detailed information about how **JESSE** encouraged CW-2 to leave Brazil and come to the United States to work at his restaurant in Woburn, Massachusetts, and how **CHELBE** arranged for CW-2 to travel from Brazil to the United

---

[9] CW-2 was born and raised in Brazil. CW-2 has no criminal record in the United States apart from entering the United States without authority, and I am unaware of any criminal record of CW-2 in Brazil. CW-2 has been informed by agents that their cooperation in this investigation could result in permission to remain in the United States. CW-2 has received Deferred Action and Employment Authorization from DHS as a result of CW-2's cooperation in this investigation. HSI has paid $3200 toward CW-2's debt to CHELBE/given CW-2 $1000 for their expenses/cooperation.

States and to enter the United States unlawfully. Specifically, CW-2 said that they knew **JESSE**'s girlfriend (now wife), who lived in the same neighborhood as CW-2 in Brazil. **JESSE**'s girlfriend introduced CW-2 to **JESSE**, who told CW-2 over the phone that if CW-2 came to the United States, CW-2 would have a house and a better life. **JESSE** said CW-2 would work for him in his restaurant and would be well paid and that the fee for getting CW-2 into the United States would be subtracted from CW-2's pay.  CW-2 met **JESSE** once in person in Brazil, at which time **JESSE** showed CW-2 a picture of his restaurant. According to CW-2, **JESSE** and his wife knew that CW-2 did not have a visa or other lawful way of coming to the United States.

47.     **JESSE**'s girlfriend took CW-2 to meet **JESSE**'s brother, **CHELBE**, at **CHELBE**'s house in Brazil. At that meeting, **CHELBE** talked about payment and the need for passports.  **CHELBE** said CW-2 would work for his brother, and the payment would be taken out of CW-2's paycheck.  **CHELBE** charged CW-2 $22,000 to smuggle CW-2 and their three children into the United States.  **CHELBE** said it would be very easy to cross the border, and that when CW-2 arrived in the United States, they would pay him.  CW-2 had no money to pay a down payment to **CHELBE** before traveling to the United States.  **CHELBE** went with CW-2 to get their passport.

48.     Approximately two weeks after **CHELBE** gave CW-2 their passport, CW-2 and their children flew from Belo Horizonte to Sao Paolo with tickets supplied by **CHELBE**.  Before leaving, **CHELBE** gave CW-2 approximately $300 for the trip.  **CHELBE** also paid for all of the flights and hotels for the trip.  CW-2 and their children stayed in Sao Paolo for approximately a day and a half at the home of friends of **CHELBE**'s before departing Brazil on a flight to Cancun that was booked and paid for by **CHELBE**.

49.     CW-2 and their children then flew to another city and went to the hotel to which **CHELBE** directed them. Later that evening, after it got dark, a Brazilian man with a van met CW-2 and their children at the hotel and drove them to a bridge at the United States border. The driver instructed them to get out, walk across the bridge and surrender to U.S. authorities.[10]

50.     When CW-2 encountered immigration authorities in the United States, CW-2 told them a story about what happened to them in their past involving the other parent of CW-2's children, which CW-2 says was a true story. Specifically, CW-2 said that their children's father got in a lot of fights, used drugs and died in a crossfire.  **CHELBE** instructed CW-2 to tell that story, saying everyone needs a story in order to enter the United States.  CW-2 spent 5-10 days in "jail" before being released to a shelter.  Once CW-2 got to a shelter, CW-2 gave the shelter personnel the name and number of a U.S. point of contact that **CHELBE** provided to CW-2 when they were at the shelter.  CW-2 did not know this person and had never spoken to them but told the shelter personnel that this was someone who was sponsoring them.

51.     After CW-2 and their children left the shelter, they flew to Boston.  **CHELBE** arranged for them to get to the airport.  Before this, CW-2 had no idea where in the U.S. they would be going but understood it would be somewhere near **JESSE**'s restaurant.  When they

---

10 U.S. Customs and Border Protection (CBP) records indicate that CW-2 and their child applied for asylum at the United States Port of Entry in El Paso, TX.  CW-2 provided CBP with a United States point of contact: telephone number 203-826-0733. This number is a YMAX Communications Corporation number. The account holder for this number is **CHELBE**.  The significance of this account is described further below.

landed, a man known to CW-2 as "Grande,"[11] who worked for **JESSE** and **HUGO**, picked them up at the airport and drove them to the house of a woman near **JESSE**'s and then they stayed with someone named Graziela Dutra Da Silva, who used to work at **TUDO NA BRASA**.  Then **JESSE** rented a house for CW-2 and their children.

52.     Shortly after CW-2's arrival in Woburn, CW-2 began working for **JESSE** at **TASTE OF BRAZIL**.  CW-2 worked 7 days a week, from about 6:30 am to about 10:30 pm, except for Sundays after 3:00 pm.  When CW-2 began working at **TASTE OF BRAZIL**, they were not sure how much they were supposed to be paid for their work, but CW-2 would only receive $100 in cash per week. CW-2 would have to ask **JESSE** for specific things they needed, and sometimes **JESSE** would give them more money. CW-2 kept track of their hours by punching a timecard. Initially, CW-2 said **JESSE** kept notes about their pay in a notebook which he kept in a safe in the office, which is next to the kitchen downstairs at the restaurant.  CW-2 said that at some point they **JESSE** paid them in part by check.  Sometimes CW-2 would deposit the checks, and sometimes **JESSE** would keep the check and give CW-2 cash.  CW-2 worked for **JESSE** for about three years.

53.     In addition to working for **JESSE** at **TASTE OF BRAZIL**, CW-2 began working for **HUGO** at **THE DOG HOUSE** shortly after it opened. CW-2 worked as a cleaner at **THE DOG HOUSE** from approximately 6:00 a.m. to 9:00 a.m. seven days a week, for which **HUGO** paid CW-2 initially $800 per month, then raised it to $1,000 per month and then went back to $800

---

[11] Based on information obtained during this investigation, I believe that the person known to CW-2 as "Grande" is Eberson Vanz, who worked for **JESSE** and **HUGO** at **TASTE OF BRAZIL** and currently works for **HUGO** at **THE DOG HOUSE**.

per month, always in cash.  CW-2 did not see **HUGO** keep any records.  CW-2 did not have to punch a timecard at **THE DOG HOUSE.** At 9:00 am, CW-2 would go to work for **JESSE** at **TUDO NA BRASA**.  **JESSE** told CW-2 that they needed to give him some of the money to pay off **CHELBE**.  CW-2 would usually only keep $100-$200 and give **JESSE** the rest.  According to CW-2, **HUGO** knew that CW-2 came to the United States with **CHELBE**.  CW-2 recounted one time when **JESSE** told CW-2 that he was going to give CW-2 this cleaning job so CW-2 could pay their debt, and **HUGO** was present and heard this.  **JESSE** would sometimes tell CW-2 how much they still owed on their debt and other times would say CW-2 was getting close but would not say how much CW-2 still owed.

54.     One of CW-2's children also worked for **JESSE** at **TASTE OF BRAZIL** for a time but quit due to **JESSE**'s verbally abusive behavior. Another of CW-2's children worked for **HUGO** at **THE DOG HOUSE** during its construction, helping to build out the restaurant as a carpenter and doing finishing work as a painter.

55.     According to CW-2, CW-2 paid **CHELBE** $800 per month for the first six months, once paying **CHELBE** directly by wiring the money to a bank account in Brazil that **CHELBE** specified; and for the other months, **JESSE** withheld money from CW-2's cash payment for work to pay down CW-2's smuggling debt.

56.     After about six months, CW-2 began paying down their debt by giving **JESSE** the $1,000 per month that **HUGO** paid them to clean **THE DOG HOUSE**. CW-2 paid **JESSE** at **TASTE OF BRAZIL**, usually in **JESSE**'s office, which is located on the downstairs floor of the restaurant, where the kitchen is also located. CW-2 paid **JESSE** in cash, which he put into a safe in his office. **JESSE** wrote down the amount CW-2 paid him in a notebook that he keeps in his office.  On one occasion, CW-2 paid **CAROLINE** at **JESSE**'s suggestion.

57.     On September 3, 2019, CW-2 made a payment at agents' direction on their smuggling debt to **JESSE** at **TASTE OF BRAZIL**. CW-2 consensually recorded the meeting. CW-2 had made arrangements to give the payment to **CAROLINE** at the restaurant, but **CAROLINE** did not show up. CW-2 asked **JESSE** if he could take the money. **JESSE** responded, "If you want to leave, leave it here. I will give it to her." CW-2 then asked **JESSE** how much he thought was still pending on their debt to **CHELBE**. **JESSE** denied knowing and said the matter was between CW-2 and **CHELBE**. **JESSE** went on to say that he does not "take … money anymore." Based on my training and experience and work on this investigation, I understand **JESSE** to be saying he does not collect smuggling debt payments anymore. He continued, "I'm getting this one because you want to leave [it] for **CAROLINE**. **CAROLINE** is only coming at four   o'clock and **CHELBE** had already told me that you would leave some money for **CAROLINE**." During further discussion of CW-2's smuggling debt to **CHELBE**, **JESSE** said, "if you … gave him three thousand, you still owe him nineteen thousand dollars. If you gave him five thousand, you still owe him seventeen thousand dollars. and you didn't give this to him. … [T]he faster you pay this debt, the better it is for your life." CW-2 said, "The only debt I made was this damn thing …." **JESSE** responded, "Oh … Why don't you go back there, gosh?! … You call him [**CHELBE**] and thank him to have put you in here, without one cent. … For giving you the opportunity. Giving an opportunity to your kids."

58.     On September 10, 2019, at 3:21 pm, **CHELBE** left a voice recording for CW-2 in which he said:

> Let me tell you, I am just waiting for an answer from **JESSE**, to check how much is left over from that time that **JESSE** sent…because he made a mess of it…do you remember it? First, he said it was one amount, later he said it was another. Then, afterwards I talked to him and he sent me the file, but it was on my other telephone.

Based on my training and experience and work on this investigation, I believe **CHELBE** was referring to an amount of money that **JESSE** transferred to him that was meant to be applied to CW-2's smuggling debt.

59.     On September 18, 2019, at 8:09 am, CW-2 left **CHELBE** a voice recording in which they said in part:

> Hey, **CHELBE**, I don't understand why you are losing it. Because I started paying the debt, I don't know why...now, I don't owe more than...the...I asked **JESSE** about the debt. I don't owe more than $20,000, my friend. I gave around 4,000, 5,000 already…I already gave, you know?! And I don't owe this debt…more than what he said. He said, "you owe more than that." Because he wants to charge interest. He said he wants to charge interest.

60.     On October 1, 2019, CW-2 had a consensually recorded (audio and video) conversation with **HUGO** at **THE DOG HOUSE**. In this conversation, **HUGO** pointed out parts of the restaurant that were dirty and told CW-2 the cleaning is too much work for CW-2 to do alone and that CW-2 wastes too much time.  CW-2 referred to their financial struggles, including being late on rent, and said, "I even thought about going back to Brazil, but how can I go back? If I have this debt. I don't even know how much I owe." **HUGO** responded that the problem was that CW-2's children were lazy and did not want to work and help pay CW-2's bills.  He denied that they could not find work because of their poor English, saying,

> Lots of woman need people to clean their homes. … If she is good in what she does…are you kidding? I can find a truckload of jobs for her. … Let me tell you one thing, if you get into…into…into…that Boston…that thing about Boston in the internet… there, there always is. You go there one  day…two days…if you are good at work, the guy will keep you. If you are bad at work, he… He will not keep you.

**HUGO** then suggested that one of CW-2's children help with the cleaning.  After more discussion about cleaning the restaurant, CW-2 again said they had no money in their bank account, adding

"if it wasn't for this debt, my friend, I think I would have left. … They say America, America …
not everything is America." **HUGO** responded:

> … [I]f you were here by yourself…uh…uh…I can guarantee you that you would
> have a lot of money…you would have paid…if you were here by yourself, working
> the way you work, you would have paid your debt and had money left.

CW-2 said, "Your dad told me this as well.  If I had been here alone, I would have already paid
my debt." **HUGO** continued:

> Yes.  So, imagine this, how much do you pay in rent?  … [I]f you were alone, just
> then…just an example, you could rent a room for $300. In only, in only one month
> you would be saving $1,300.

61.    I believe, based on my training and experience and work on this investigation, that
**HUGO** was advising CW-2 to tell their children to move out so that CW-2 could pay less in rent
and more easily pay off CW-2's smuggling debt to **CHELBE**.  CW-2 complained that another
worker was making $800 per week and has already paid **CHELBE** $5,000.  **HUGO** responded, "I
will show you the papers that he signs. He makes 400, 500." I believe, based on my training and
experience and work on this investigation, that **HUGO** was referring to payroll records that he
keeps at **THE DOG HOUSE**. **HUGO** asked CW-2 how much he owed them for the cleaning.
After CW-2 said, "Thousand," **HUGO** walked with CW-2 over to **TASTE OF BRAZIL**. They
walked downstairs to the office, where **HUGO** took $1,000 in cash out of a safe, counted it, and
gave it to CW-2.  I believe, based on my training and experience and work on this investigation,
that this was an under-the-table payment of wages to CW-2 in cash so that **HUGO** could evade
payroll tax and withholding obligations on the wages paid to CW-2. On October 3, 2019, CW-2
sent a text message to **CHELBE** over WhatsApp in which CW-2 denied that they owed $24,000.
**CHELBE** responded immediately by voice recording over WhatsApp,

Hey, [CW-2], I told you this before. I'm not the one who is controlling this. It's [my wife], because I don't have any room in my head to keep track of all of this and I don't have time either, because I'm dealing with the store, so I'm busy all day…then, she passed on this information. [BACKGROUND: NOISE] You check with her and check with **JESSE** as well, if it was this amount, the part that he has sent…and you check your own records as well, to see if [my wife]'s math is right. If there is any discrepancy, you let me know; I'll talk to [my wife] and I'll try to find out if there is something wrong and what is wrong, so she can fix it. Sounds good? Thank you.

CW-2 responded immediately by voice recording,

I know it. But our deal was 22,000. **JESSE** told me it was 22. For the three. Why is it this value now? I don't understand it, man! **JESSE** told me it was 22,000. You told me this as well, 22,000…for the three.

**CHELBE** responded by voice recording,

[CW-2], before you talk to **JESSE**, ask other people…before you talk to **JESSE**…sometimes…ask someone that you know that has arrived through Mexico... other people [BACKGROUND: NOISE] that are there. Uh…ask [Individual 1] that is there…that works in the restaurant with **JESSE**. Uh…who else can you ask? Uh…this boy, [U/I], that works…that is working with **JESSE** as well…with **HUGO**. Uh… I don't know…there ought to be more people that you know that arrived through Mexico. [BACKGROUND: NOISE] You have to ask other people first. What is the amount that they are paying? "What is the amount that their paid to come there, to the United States?" How much is this trip? Is it $100? Is it $500? $100,000? How much is a trip like this one? From, from Brazil to the [BACKGROUND: NOISE] United States, going through Mexico? [BACKGROUND: NOISE] This is the question that you have to ask other people first.

CW-2 responded that they were not going to ask others what they paid, because they are absolutely sure that their deal with **CHELBE** was for $22,000. CW-2 then responded by voice recording,

I know [Individual 2]. [They] came through Mexico. [Individual 3] came…[they] paid eighteen …they are paying it. I don't know if they are late because they are unemployed. Look at how much you charged [Individual 2]; [Individual 1]'s brother; uh… their family that is coming now. These are the only ones I know…[Individual 2]'s father, that you have made a deal with. Then, so far there is nobody else that I know of. Then…uh…my deal was this…and where is the money that I gave to **JESSE**, gosh? Where are the months that I have worked for

**JESSE**?  He said I could be carefree… I know you don't have anything to do with this, because it's me and him who takes care of my payments. Then, he and I will discuss this.

**CHELBE** responded by voice recording in part:

> Nobody would have taken you there, you guys didn't have a single penny in your pockets ...Maybe it wasn't a good idea for you guys to go to America. Maybe it was fine wherever you were here. But you guys asked me. I helped you ... You can do whatever you want. You can say, "**CHELBE**, I'm not going to pay you." Done. It's over. But there is someone up there that is looking out for me…He is looking out for you. He controls our destinies. He controls everything that happens in your life…good things and bad things. I'm a man of faith. I'm a man of faith. Then, I know what I'm doing for people…how I am helping.

I believe, based on my training and experience and work on this investigation, that **CHELBE** was referring in this conversation to the many people that he has smuggled into the United States and what he charged them and to the fact that, unlike other smugglers would have done, he agreed to smuggle CW-2 and their family without any down payment.

62.     On October 16, 2019, **CHELBE** left a voice recording for CW-2 asking them if CW-2 could "look after" a boy for a few days in exchange for money. I believe, based on my training and experience and work on this investigation, that **CHELBE** was trying to make arrangements with CW-2 for housing and childcare for one of the minor migrants he had smuggled into the United States, which is part of the smuggling services he provides.

63.     Between October 29 and November 1, 2019, **CHELBE** left a series of voice recordings for CW-2 asking them to give their next smuggling debt payment of $700 to Individual 5, who was one of the recently arrived migrants, instead of sending it to **CHELBE**, because Individual 5's spouse had given **CHELBE** $700 in Brazil, and Individual 5 had borrowed $700 from **JESSE** to pay their rent. As background, on October 1, 2019, Individual 5 illegally entered the United States with their one-year-old son and purported spouse, Individual 6. All three were

apprehended by U.S. Border Patrol agents assigned to the El Paso Station. Individual 6 claimed to

be married to Individual 5 and told agents they were the biological parent of the minor child.  It

was later determined through DNA testing that Individual 6 was not the biological parent of

Individual 5's son. Individual 5 was released on GPS monitoring and on October 15, 2019 flew to

Boston from El Paso, Texas with their son. Agents and other investigators conducted physical

surveillance of the arrival of Individual 5's group at Logan Airport in Boston. While waiting to be

picked up, Individual 5 sat down on a bench next to an HSI Special Agent. Individual 5 asked the

agent if he spoke Portuguese, and he said he did not, but the two had a brief conversation using

the Google Translate app on the agent's phone. The agent asked if Individual 5 was being picked

up by someone, and they said yes and asked to use the agent's phone. Individual 5 asked the agent

if he had WhatsApp on his phone, and he said he did not but could download it. After downloading

WhatsApp, the agent handed the phone to Individual 5, who typed the number **+55 314 9727 3586**

into the agent's phone. This is **CHELBE**'s number. Individual 5 could not reach **CHELBE** in this

call and ended up using the phone of another individual in their group. Individual 5 was picked up

by someone driving a vehicle registered to Individual 7. Individual 7 is a former employee of

**TASTE OF BRAZIL** who entered the United States illegally on July 16, 2016. Individual 7

provided agents a United States point of contact for Julio Morais, who is **CHELBE**'s nephew. I

know from my work on this investigation that **CHELBE** frequently gives Julio's contact

information to smuggled Brazilians for assistance with United States immigration matters.[12] After

---

[12] On October 30, 2019, Individual 5 reported to the DHS/ICE office of Enforcement and
Removal Operations (ERO) in Burlington, MA. During an interview conducted during that visit,

departing the airport, Individual 5 was driven to **TASTE OF BRAZIL**. Individual 5's Enforcement & Removal Operations (ERO) GPS bracelet showed they were at the restaurant for approximately 50 minutes.

64.     On November 1, 2019, CW-2 left a voice recording for **CHELBE** in which CW-2 said they had already asked **HUGO** to deduct the cleaning money all at once so it will not generate interest:

> Don't keep charging me interest and things like that. Then, you could talk to him to see what he…because he doesn't answer me. To see if he can keep the money directly and not give it to me. It's better, because we finish this thing right away and, and it won't come to me…uh…I will not be charged more interest.

CW-2 was referring to the fact that they wanted **HUGO** to keep all of their cleaning wages and give the money directly to **CHELBE** to pay down CW-2's smuggling debt more quickly so they did not have to pay interest to **CHELBE**. A few minutes later, **CHELBE** left a voice recording for CW-2 saying,

> Hey, [CW-2], you can leave it, that I will resolve this. I will talk to **JESSE** [BACKGROUND: NOISE] and I'll talk to **HUGO** and we'll solve this over there. Don't worry about this. [BACKGROUND: NOISE] It's going to be alright. Okay? God bless." He followed this with another voice recording saying, "Hey [CW-2], [LAUGHS SOFTLY] Even I sometimes have difficulty talking to **HUGO**, you know, he always calls me, I leave a message and he calls me, but I'll talk to him today, you can rest assured, as soon as I talk to him, I'll let you know, okay? Thank you!

65.     On November 2, 2019, CW-2 had a consensually recorded conversation with **JESSE at TASTE OF BRAZIL**. At the beginning of the recording, **JESSE** is on the phone and can be heard saying, "Oh shit! Look here; I, I, I don't know, Chelbe, I won't, I won't get into this,

---

Individual 5 claimed to have paid their own way to Mexico and entered the United States on their own without the assistance of a smuggler.

I'm just going to tell you how it is; talk to you partner, you talk to your partner, talk to your partner there and tell them that they are not paying; that's all there is, I don't care; alright Chelbe, alright. I know, okay my brother, be with God, bye, bye." Based on my training and experience and work on this investigation, I believe **JESSE** was referring to an unpaid debt owed to **JESSE** by **CHELBE**'s partner in the migrant smuggling business. After another brief phone conversation, **JESSE** turned to CW-2 and said, "Let me tell you one more thing, you are playing with fire.…" The conversation continued:

| | |
|---|---|
| CW-2 | Mm-hmm, I already know it. |
| **JESSE** | The problem is that you don't care about shit; you don't care about my things; you don't care about anything. |
| CW-2 | **CHELBE** said that I am playing with fire. |
| **JESSE** | That's true; I'm telling you; It doesn't matter to me, to me it makes no difference, I'm just putting this here for you to see… [U/I]. |
| | [VOICES OVERLAP] |
| CW-2 | If you want to put the woman at the house; if you want to put the woman at the house; leave her at the house, pay her rent and I'll hit the road; the end; It's as simple as that to resolve. You ask her to stay until February, like it's under your name, you can leave her there, no problem; it makes no difference to me, and starting tomorrow, that's it, I'll leave the house. It's simple to resolve. And then I'll go away; if I have to play with fire… |
| **JESSE** | [U/I] You are playing with fire, for sure. |

[VOICES OVERLAP]

CW-2            Yessss and so, I am aware that I'm playing with fire, you just finished saying…

[VOICES OVERLAP]

**JESSE**        [CW-2].

[VOICES OVERLAP]

CW-2            There is no problem … don't bring my [child] into this … there is no problem.

**JESSE**        It's him.

CW-2            Yes, there is no problem.

**JESSE**        It's him.

CW-2            There is no problem. This, what you are saying that's him, there is no problem.

[VOICES OVERLAP]

**JESSE**        [U/I] You are playing … [U/I].

CW-2            Yes, we are playing **JESSE**…if we get burned, if we get burned, where are we going to go? We'll be underground, right?

**JESSE**        Sometimes not.

CW-2            Is not underground?

                [VOICES OVERLAP]

**JESSE**         Sometimes not.

CW-2            If you are burned by fire, where do you go? Goes underground.

**JESSE**         Sometimes not.

CW-2            Underground, and if you go underground, that's it, no more problem, it's solved.

                [VOICES OVERLAP]

**JESSE**         Sometimes, some people get burned and they suffer… they suffer.

                [VOICES OVERLAP]

CW-2            There is no problem, there is not a problem, above the ground there is no problem; the only problem is if the person goes underground. Only. And if you are underground the problem is over. It's simple. The end. [BACKGROUND: VIBRATION SOUND] I think they have to do what they have to do and that's it.

**JESSE**         …I am just telling you. Why are you, why are you like that?

CW-2            I am not like that Jesse! Why?!

                [VOICES OVERLAP]

**JESSE**　　　　Why don't assume your responsibilities, your commitments? Why don't you do the right thing?

CW-2　　　　I am doing it…

**JESSE**　　　　No, you are doing [U/I].

　　　　　　　[VOICES OVERLAP]

CW-2　　　　I am here working for you! Do I leave this place?!

　　　　　　　[VOICES OVERLAP]

**JESSE**　　　　[U/I] I am not talking about that; I'm talking about the way you manage your finances.

　　　　　　　[VOICES OVERLAP]

CW-2　　　　I am doing it; I am doing it…I live inside this place, I'm always inside this place;

　　　　　　　[VOICES OVERLAP]

**JESSE**　　　　And it's not working.

　　　　　　　[VOICES OVERLAP]

CW-2　　　　I get here at 9:00 in the morning, I clean; don't do that to me…

　　　　　　　[VOICES OVERLAP]

| | |
|---|---|
| **JESSE** | But why don't you manage the rest? Why don't you pay the bills? |
| | [VOICES OVERLAP] |
| CW-2 | Because it's just me, it's just me for now working. |
| | [VOICES OVERLAP] |
| **JESSE** | Not for now, for your whole life. |
| | [VOICES OVERLAP] |
| CW-2 | There is no problem **JESSE**! That's the way it is, I am a [parent]! |
| | [VOICES OVERLAP] |
| **JESSE** | No, but you have your commitments. |
| | [VOICES OVERLAP] |
| CW-2 | I am a [parent]! |
| **JESSE** | Nothing to do with being a [parent]. |
| CW-2 | Oh **JESSE**, there is no problem; let's go, let's go see what I owe here … |

66.     On November 3, 2019, CW-2 had a consensually recorded conversation with **HUGO** at **THE DOG HOUSE** in which they told him that their electricity had been shut off and CW-2 asked **HUGO** to lend them money so they did not have to borrow from someone who charges interest:

| | |
|---|---|
| CW-2 | You lend this money here until Wednesday. I know who has it and will lend me $1,000 for me to replace the money, understand? If I don't pay…uh…this…Tuesday, I will be without electricity. Can you believe it? [U/I] Thank God, I'm sure [U/I] then, on Wednesday a person will lend me $1,000 for me to pay with interest. I will not pay with interest. Because I need…I will stay without electricity. Then, I will do like this, then, I will…I will tell him that, starting next month, I will forget about this money, you know? I…[U/I] don't know…he already sent me I don't know how many texts, that it was for me to get it with you to pass it on to your father. Then, I said to him, "Hey, hey **CHELBE**, who knows if you…Hugo, passes on the money of my cleaning?" |
| **HUGO** | No. I don't have anything [U/I]…I don't want…I don't even…like…I don't have anything, anything to do with this. I don't like problems. |
| CW-2 | Mm-hmm. |
| **HUGO** | I don't have nothing… |
| CW-2 | I will talk to him because I need to pay this Tuesday. |
| | [VOICES OVERLAP] |
| **HUGO** | [U/I] I prefer, I'd rather not know what you guys are doing. To tell you the truth. |
| CW-2 | Mm-hmm. Then, would it be possible for you to deduct the 300 from me next week? |
| **HUGO** | I will tell you…I will need to take it from next week's then. |
| CW-2 | Mm-hmm. |
| **HUGO** | [U/I]. |
| CW-2 | You can take it from the next. |

I believe, based on my training and experience and work on this investigation, that when **HUGO** said, "I'd rather not know what you guys are doing," he was well aware that CW-2 was referring to their smuggling debt to **CHELBE** but wanted to preserve his deniability because he knew it

was an illegal arrangement under which they came to, entered and remained in the United States unlawfully.  I believe that when **HUGO** agreed to deduct $300 from CW-2's wages for the next week, he was agreeing that that money would be paid to **JESSE** to reduce CW-2's smuggling debt.

67.     On November 23, 2019, CW-2 reported that another family had arrived and that **JESSE** had asked CW-2 to host them. Based on my training and experience and work on this investigation, I believe this refers to another family that **CHELBE** had smuggled into the United States for whom **JESSE** was trying to obtain temporary housing.

### *Information from SOI-1 and Obtaining Fake Documents for Employees*

68.     A Source of Information (SOI-1), who is a Brazilian national who was smuggled into the United States by **CHELBE**, provided information about **CHELBE**'s smuggling operation and SOI-1's employment at **TASTE OF BRAZIL**.  According to SOI-1, SOI-1's parent, CW-2, paid **CHELBE** to smuggle the family unit into the United States.

69.     Upon arrival in Boston, SOI-1 and their family were picked up at the airport by an individual called "Grande," who drove them to **TASTE OF BRAZIL**.  I am aware from this investigation that "Grande" is the nickname for Eberson Vanz, a longtime employee of **JESSE** and **HUGO**.

70.     SOI-1 stated **JESSE** employed them as a dishwasher at **TASTE OF BRAZIL**. SOI-1's shift was from 8:00 am to 11:00 pm.  **JESSE** would pay SOI-1 but subtracted SOI-1's smuggling debt to **CHELBE** from SOI-1's pay. **JESSE** paid SOI-1 in cash and would decide how much to pay.

71.     When SOI-1 began work at the restaurant, **JESSE** and **HUGO** talked to SOI-1 about getting fake documents from **CHACON**.  SOI-1 knew **CHACON** by sight, because **CHACON** occasionally worked at **TASTE OF BRAZIL**.  SOI-1 said **JESSE** loaned them $200

cash to give **CHACON** for the documents. SOI-1 stated that **CHACON** gave them the documents in **TASTE OF BRAZIL**, instructing SOI-1 not to talk about this transaction and claiming he had nothing to do with it. SOI-1 stated **HUGO** deducted the $200 from their paycheck in installments until the loan was repaid. SOI-1 handed the envelope with the documents to **JESSE**, who then called **HUGO** over and handed the envelope to him.  **HUGO** advised the SOI to not walk around with fake documents because SOI-1 could get arrested. **HUGO** said it would be best if **HUGO** kept the documents, and he did so.

72.    **JESSE** reportedly threatened SOI-1 on multiple occasions if SOI-1 didn't pay the smuggling debt owed to **CHELBE**. **JESSE** would claim he knew people that would send SOI-1 to Brazil. **JESSE** would claim that once in Brazil, these people would exterminate SOI-1 and their family.

73.    SOI-1 stated that **HUGO** would tell them to pay **CHELBE**. **HUGO** would reportedly warn SOI-1 that his uncle (**CHELBE**) works with dangerous people that would find SOI-1 wherever they go.

74.    SOI-1 stated that they made a $600.00 smuggling debt payment to **CHELBE**'s daughter, Carol (**CAROLINE**). SOI-1 estimates this was approximately six months after their arrival in the United States.

75.    SOI-1 stated they made additional smuggling debt payments to **CHELBE** by wiring money via Western Union to unknown individuals in Mexico. **CHELBE** would reportedly subtract the amount of these wires from SOI-1's debt.

76.    CW-2 advised that they also obtained identity documents from **CHACON** in approximately the fall of 2018.  CW-2 described the circumstances leading up to this purchase as follows.  CW-2 said that **JESSE** told CW-2 they would need a Social Security card to work in the

restaurant.  He gave them a contact for a man named **MARQUITO** (nickname for **CHACON**) who supplied CW-2 with a Social Security card.  On another occasion, CW-2 explained that they were arguing with **JESSE** in the kitchen of **TASTE OF BRAZIL** when **HUGO** overheard and asked what was happening. CW-2 explained to **HUGO** that they were not getting paid enough money to support themself.  **HUGO** advised CW-2 to buy identity documents, and they would start getting paid by check directly from him, instead of from **JESSE**.

77.      Days later, CW-2 recalls they were again crying at work and **HUGO** called them into the restaurant office.  **HUGO** reportedly asked why CW-2 was crying.  CW-2 explained to **HUGO** that **JESSE** was keeping most of their earned money to pay **CHELBE**.  **JESSE** reportedly would only allow CW-2 to take $100 per week.  CW-2 said that **HUGO** told them that his father's actions were wrong.  **HUGO** reportedly stated the right thing would be for CW-2 to get paid and then pay their smuggling debt directly to **CHELBE**, not **JESSE**.  **HUGO** then told CW-2 that there was a person named **MARQUITO** that made everyone's documents at the restaurant. **HUGO** advised CW-2 to ask another restaurant employee named Graziela for **MARQUITO**'s phone number to get the documents made.

78.      CW-2 contacted **MARQUITO** and was instructed to give him a photo and their biographical information.  Approximately one week later, **MARQUITO** came to the restaurant and delivered the documents to CW-2 while they were working in the kitchen. CW-2 believed they paid **MARQUITO** $180 or $200 for the documents.  CW-2 did not know what a Social Security card was and did not know that the documents were fake.

79.      CW-2 stated they went into the restaurant office, told **HUGO** that **MARQUITO** had delivered the documents and handed them over to **HUGO**. The next day, **HUGO** returned the documents to CW-2, and they began receiving regular pay checks.

80.     On February 4, 2020, as part of this investigation, CW-2 contacted **CHACON** via WhatsApp and requested fraudulent documents for employment purposes. **CHACON** agreed to provide fraudulent documents for a fee of $200. On February 20, 2020, CW-2 had a consensually recorded meeting with **CHACON** at **TASTE OF BRAZIL** to purchase the fraudulent documents. Agents conducting physical surveillance of the meeting saw **CHACON** arrive at **TASTE OF BRAZIL** on a motorcycle. During this meeting, **CHACON** gave CW-2 a fraudulent Social Security card[13] and a fraudulent Permanent Resident card in exchange for $200 in official U.S. government funds that agents provided to CW-2 in advance for this undercover purchase. During this meeting, Individual 1 was present and referred to **CHACON** by his first name, which Individual 1 knows because **CHACON** formerly worked at **TASTE OF BRAZIL**. In the presence of **CHACON**, CW-2 said, "Other time I did a document with Marquito, and he charged me $180. Now that I did this new document, this smart as[s] charged me $200." **CHACON** did not respond. The conversation continued:

| | |
|---|---|
| CW-2 | Where's the document, but with an ugly, horrible picture!" |
| Individual 1 | I only did the Green Card because of the payment. I have to. Do you think that I would do this shit? [U/I] Now that I have the Social Security Number, do you think I need? I'm a [person] with a Social. |
| CW-2 | Wow, a [person] that has a Social! If you have a Social, you are good, right? [ASIDE: SPANISH: you have everything] [BACKGROUND: UF: You have everything.] [ASIDE: Thank you very much, Marquito [nickname for |

_____

[13] The Social Security Administration Office of Inspector General has confirmed that the Social Security card is fraudulent.

| | |
|---|---|
| | **CHACON**]. When you need it again, you will do it, won't you? |
| Individual 1 | I have a Social Security, I'm a [person] that has a Social Security card. |
| CW-2 | When you need it again, you will do it, won't you? |
| **CHACON** | [PORTUGUESE, SPANISH CROSSOVER: I will give you the phone number of the guy [LAUGHS] and I don't know how to speak [U/I]]. |

**CHACON** then said he was leaving. An unidentified male then said, "[SPANISH] [U/I] [other nickname for **CHACON**], [U/I] is it cold on the motorcycle?" After the meeting, agents took custody of the Social Security card and Permanent Resident card (Green Card) **CHACON** sold to CW-2.

### The Use of the YMAX Accounts to Provide Fake U.S. Contact Information

81.      The two YMAX phone numbers mentioned above, 203-826-0733 and 781-451-7505, have been given as a U.S. point of contact by over 40 Brazilian migrants, who have attributed the numbers to various fictitious identities.   The provider for this number is YMAX Communications Company, which provides service for MagicJack, a voice over internet protocol (VOIP) service.   The listed subscriber on the 781-451-7505 account is a Marcos Deleon in Wakefield, but a device associated with the account is called "Iphone de Moraes".   On August 27, 2019, **CHELBE**'s daughter **CAROLINE** updated the account to add her name as an alternate subscriber, along with her phone number **781-608-5201** and a MasterCard credit card ending in 3189.  A pen register on this phone shows frequent contact with airlines, hotels and travel agencies and with **JESSE**, **CAROLINE**, **HUGO**, and the 203-826-0733 YMAX phone associated with **CHELBE.**

*Smuggling and Employment of SOI-3*

82.     A source of information ("SOI-3"), who is a relative of Individual 2's, was smuggled into the United States by **CHELBE**. On May 15, 2021, Border Patrol agents apprehended SOI-3 and their spouse and child after they illegally entered the United States near the Yuma, Arizona border. SOI-3 provided the following information about their smuggling trip.

83.     SOI-3 agreed to pay **CHELBE** $18,000 to be smuggled into the United States. This smuggling fee also included the illegal entry of SOI-3's spouse and child. **CHELBE** arranged for SOI-3 to get passports from a local passport office in Brazil. SOI-3 stated that they received a receipt of payment for the passports, and the passport payments were paid from a Bradesco Bank account SOI-3 said belonged to **CHELBE'**s brother **JESSE**.

84.     Several days before entering the United States, SOI-3 and their family unit were picked up at their residence in Brazil and driven to an airport in Rio de Janeiro. SOI-3 stated that the driver who picked them up was named Geraldo and was the father of **CHELBE'**s wife, ISABELLA**.** At SOI-3's house, Geraldo also gave SOI-3 an envelope of money.  SOI-3 stated that **CHELBE** had instructed them to use the money to pay various individuals that they would encounter on their smuggling trip. I believe, based on my training and experience and my work on this investigation, that this was a reference to various people in Mexico that assist with the smuggling operation.  SOI-3 also stated that Geraldo took a picture of SOI-3 and their family prior to their flight from Rio de Janeiro and sent the photo to **CHELBE**.

85.     SOI-3 and their family flew from Rio de Janeiro to Sao Paulo. From Sao Paulo, they flew to Tijuana, Mexico. SOI-3 stated that **CHELBE** paid for their flights. At the airport in Tijuana, Mexico, SOI-3 and their family were approached by an airport employee near passport inspection. The airport employee showed SOI-3 a photo of SOI-3 and their family that Geraldo

had previously taken of them. SOI-3 stated that they understood the airport employee showing them their picture to mean that the airport employee was assisting **CHELBE** in their smuggling trip. SOI-3 stated that they paid the airport employee with money that Geraldo had given them prior to leaving Brazil. SOI-3 stated that they and their family passed through passport inspection with no issues.

86.    The family then flew from Tijuana, Mexico to Mexicali, Mexico. At the Mexicali airport, SOI-3 and their family were approached by a taxi driver. The driver also showed them the photo Geraldo had taken of them. SOI-3 paid the taxi driver $200 with money that Geraldo had given them. The taxi driver then drove them to a motel that was about a two-hour drive from the Mexicali airport. The taxi driver also gave SOI-3 a SIM card so they could continue to communicate with **CHELBE** using WhatsApp.

87.    SOI-3 and their family checked into the motel. After they checked into the motel, an individual identified as Lupito came to the family's room and informed the family that he was assisting **CHELBE**. **CHELBE** instructed SOI-3 over WhatsApp to give Lupito $1,500.

88.    SOI-3 stated that they were later driven about an hour and a half from the motel to an area close to the U.S. border. SOI-3 stated that the area appeared to be a junk yard. A Mexican female led SOI-3 and their family on foot to the U.S. border. The Mexican female did not enter the United States but directed SOI-3 and their family to go further north over the border. After crossing the border, SOI-3 and their family were apprehended by CBP agents near Yuma, Arizona.

89.    SOI-3 stated that **CHELBE** told them to erase all the messages between SOI-3 and **CHELBE** before crossing the border.

90.    After SOI-3 and their family were released by Immigration authorities, they flew from Tucson, Arizona to Boston, Massachusetts. SOI-3 said **CHELBE** paid for their flight to

Boston.   Prior to the flight, the family was placed in a shelter in the Tucson area.  **CHELBE**'s

daughter, **JANAINA,** purchased food that was provided to the family at the shelter.

91.    Once they arrived in Boston, SOI-3 and their family were picked up at the airport

by **JESSE** and taken to his restaurant, **TASTE OF BRAZIL**, in Woburn.

92.    SOI-3 began to work for **JESSE** at **TASTE OF BRAZIL**. SOI-3 worked in the

kitchen, preparing food and washing dishes. SOI-3 and their family lived in an apartment in

Woburn that was secured for them by **JESSE**. **JESSE** loaned SOI-3 and their family money for

the first and last month's rent and security deposit for the apartment. **JESSE** told SOI-3 that he

had paid the smuggling debt that SOI-3 owed to **CHELBE** for smuggling them into the United

States and that SOI-3 now had to repay **JESSE** for the smuggling debt in addition to the money

he loaned SOI-3 for the apartment.

93.    SOI-3 worked for **JESSE** at **TASTE OF BRAZIL** for approximately six months.[14]

SOI-3 never received a paycheck from **JESSE** for their work during that period. SOI-3 said that

**JESSE** was demanding and verbally abusive to SOI-3 during the time that they worked for **JESSE**.

94.    SOI-3 stopped working at **TASTE OF BRAZIL** due to their mistreatment by

**JESSE** and began working for **HUGO** at the **DOG HOUSE**. During the last approximately three

weeks that SOI-3 worked for **JESSE** and **HUGO**, SOI-3 worked at both **TASTE OF BRAZIL**

and **THE DOG HOUSE**.  During this time, SOI-3 worked approximately twelve hours a day, six

days a week.  **HUGO** gave SOI-3 a receipt for approximately $500 each week but kept the money.

---

[14] In a prior interview, SOI-3 estimated this period as approximately one month.

Instead, **HUGO** said he was giving the money to **JESSE** to pay down SOI-3's smuggling debt.[15]

The only time **JESSE** gave SOI-3 any money was for a particular medical expense, and he occasionally loaned SOI-3 a debit card to pay for groceries. SOI-3 used a plastic card to clock in and out of work.

95.    SOI-3 stated they had been threatened by **JESSE** multiple times, including once in **JESSE'S** office on the bottom floor of **TASTE OF BRAZIL**.

96.    SOI-3 met with **HUGO** once in his office on an upper floor of the **DOG HOUSE**. SOI-3 saw a safe and a computer inside the office and said the office is locked from the outside.

### *Additional Information About Involvement of CAROLINE and JANAINA*

97.    The investigation has shown that **CHELBE**'s daughters **CAROLINE** and **JANAINA** have been involved in the smuggling business in more ways than just collecting money from smuggled migrants.

98.    American Airlines records show that on April 20, 2019, **CAROLINE** purchased a flight from El Paso, TX, to O'Hare International Airport in Chicago for two migrants from Brazil who had entered the United States unlawfully.  The migrants, Elber Junior Da Costa and his son Diego Ribeiro Da Silva Costa, entered the United States on April 16, 2019, by crossing the Rio Grande approximately one mile west of the Paso Del Norte Port of Entry in El Paso, TX.  They did not claim asylum when encountered.  The American Airlines records show that **CAROLINE** paid for the tickets using the MasterCard credit card ending in 3189, mentioned above in

---

[15] In a prior interview, SOI-3 said they were paid approximately three times by **HUGO**, but in a subsequent interview, they clarified the "payment" as above.

connection with the YMAX account, in the name Caroline De Moraes, with the address 4 Archstone, Reading, MA 01867.  I am aware that this is an address **CAROLINE** has used in the past.  The phone number associated with this purchase is **781-608-5201**, is also associated with **CAROLINE** in the records of the YMAX account.  I believe, based on my training and experience and work on this investigation, that these two migrants had been smuggled into the United States by **CHELBE** and that **CAROLINE** was knowingly assisting with their transportation from Texas to another location in the United States in furtherance of the smuggling conspiracy.

99.     On February 7 and 15, 2019, **CAROLINE** wired $1,500 and $1,000, respectively, to **CHELBE** in Brazil.  The phone number she gave when sending this wire transfer was **781-608-5201**.  I believe, based on my training and experience and work on this investigation, that this wire transfer consisted of money **CAROLINE** collected from migrants that had been smuggled into the United States by **CHELBE**.

100.     On February 18, 2019, **CAROLINE** wired $900 to an individual in Mexico named Geraldo Romulo Da Rocha ("Romulo").  The phone number she gave when sending this wire transfer was **781-608-5201**.  CW-1 advised that when they were in Cancun during their smuggling trip, **CHELBE** provided them with the phone number of a Brazilian named Romulo who works for **CHELBE** and lives in Cancun.  CW-1 met Romulo once at the hotel pool, and Romulo gave CW-1 500 pesos.  I believe, based on my training and experience and work on this investigation, that the Romulo **CAROLINE** wired money to in Mexico was the same one who met CW-1 in Cancun and gave CW-1 money, and I believe that **CAROLINE** wired this money to Romulo at **CHELBE**'s behest in furtherance of the smuggling conspiracy.

101.     The investigation has shown that **JANAINA** also participates in the smuggling operation in various ways.  For instance, on June 10, 2021, **JANAINA** received a call on **781-640-**

**3632** from a Brazilian migrant who was detained after entering the United States unlawfully.  The detainee, Nilson Rodrigues Pimintel, who was calling from an immigration detention facility on a recorded line, said to **JANAINA**, "I did an interview here where I am and they asked me for your father's phone number, his name and asked me for his last name. But I didn't have his last name. I would like his last name please. In case they ask me again, I have something to tell them you know."  **JANAINA** said, "My father's?" and Pimintel said, "Yeah, Eduardo's."  At that point, **JANAINA** apparently realized who Pimintel was. She then answered Pimintel's question by saying, "It's Silva."  Pimintel said, "Eduardo Silva?" and **JANAINA** said, "Yes.  Oh my.  I'm sorry Nilson I thought I was talking to another Nilson."  She then said, "How are you guys? Nilson, I will be waiting for you guys at home."  Pimintel then said he could not speak to her father because he has COVID and can't talk, so "the guy" "gave me your number. … In case they ask your number to call and ask your last name… I would like your last name as well."  **JANAINA** said, "It's Silva also, it's the same."  Pimintel then said, "I did the interview you know. Yesterday they called me to give me the answer regarding my interview, but I didn't have an interpreter, so I didn't have the result of the interview.  So we are waiting to be called again."  **JANAINA** said, "Ok, they can call me even without an interpreter, ok. They can call me. … But are you ok, are you guys ok?  My father had told me about you guys."  Pimintel assured her that everything is well.  **JANAINA** then said, "If you need anything you can call me, ok?"

102.    On June 29, 2021, Pimintel was interviewed by personnel from U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO).  He provided the following information.  He said he was from Minas Gerais, Brazil.  He took a plane from Brazil to Mexico and a friend named Morais (unknown last name) purchased the flight for him.  He paid 10,000 Real for the trip and did not know anyone who traveled with him.  He said he was issued a

list of people to contact in the United States: Eduardo Silva, Fatima Silva (wife of Eduardo), **JANAINA** Silva (daughter of Eduardo) (**781-640-3632**) at the address 91702 Dennison Ave #119, Framingham, MA.[16]

103.    I believe, based on my training and experience and work on this investigation, that, when **JANAINA** was speaking with Pimintel, she knew from speaking with her father, **CHELBE**, that Pimintel had entered the United States unlawfully with **CHELBE**'s assistance, and **JANAINA** was knowingly posing as a U.S. point of contact for Pimintel using a false name, intending that Pimintel would provide that false information to ERO.   Moreover, I believe **JANAINA** intended to provide false information herself to ERO if she was called about Pimintel.

104.    On at least three occasions in late May and early June, 2021, **JANAINA** wired money to an individual named Geisiane De Moura Silva Batista ("De Moura") in Brazil.   The phone number **JANAINA** listed in connection with these wire transfers was **781-640-3632**.   De Moura was identified in a comprehensive October 2021 Reuters article about **CHELBE**'s human smuggling operation as someone Brazilian authorities claim handled the finances of the smuggling operation.[17]   The article reports that "Janaina Moraes, who lives near Boston, told Reuters she occasionally used her phone to manage hotel check-ins for her father's clients, or to buy them food, but denied working for him."  *Id*.  I believe, based on my training and experience and work on this

---

[16] The phone number for **JANAINA** is correct, but the address is not.

[17] *See* "*As Brazilians flock to the U.S. border, an alleged smuggler cashes in,*" https://www.reuters.com/world/americas/brazilians-flock-us-border-an-alleged-smuggler-cashes-2021-10-12/, last accessed September 27, 2022.

investigation, that **JANAINA** was knowingly assisting the smuggling operation by wiring money to De Moura and that when she uses her phone to manage hotel check-ins or buy food for her father's clients, she knows they are smuggled migrants and that she is furthering the smuggling conspiracy by doing so.

105.    On June 17, 2021, I and a Task Force Officer who speaks Portuguese went to **TASTE OF BRAZIL** in an undercover capacity and confirmed that **JANAINA** was working in the restaurant.  At one point, the Portuguese-speaking investigator observed **JANAINA** speaking Portuguese on a cell phone at the back of the restaurant.  He overheard her say, "When you get to Mexico there is no …."  He then entered the men's bathroom and listened to the conversation through the bathroom door and overheard the following statements by **JANAINA**: "They ask questions to see if [you] say anything" … "It's not illegal to get to Mexico, there are no restrictions" … "So, if there is someone big or a politician, they can try to see if you give them up" … "So it will get dragged.  There is no problem.  She worked in the factory and had direct contact with your father."  The investigator then exited the bathroom and sat at a table and observed **JANAINA** return to the front counter where she met **JESSE**.  **JANAINA** then explained her phone call to **JESSE**, who nodded in approval.  She then made the following statement, translated into English: "What is illegal is the crossing, but even then, you have to prove that he was the one that was …."  The investigator was unable to hear the end of the conversation.  I believe, based on my training and experience and work on this investigation, that in this phone call **JANAINA** was knowingly coaching and advising a migrant who was being smuggled into the United States by **CHELBE**.

106.    The investigation has also shown that, like **CAROLINE, JANAINA** assists the smuggling operation by collecting smuggling debt payments by migrants.  For instance, in April,

2021, **CHELBE** told CW-1 that they could pay either of his daughters, **CAROLINE** or **JANAINA**.  In July, 2021, **JANAINA** texted CW-1, using **781-640-3632,** identified herself as **CHELBE**'s daughter, and said, "My father asked me to contact you about some $$." CW-1 wrote, "I talked to him yesterday. Are you taking care of things for him now?"  **JANAINA** responded, "He just asked to get some money to send to him in Brasil."  **JANAINA** offered to accept the money at her residence or by Venmo or via another trusted individual.  Ultimately, CW-1 paid the money to **CAROLINE**, telling **JANAINA**, "it worked out I was able to make the installment payment for the trip to your sister."  **JANAINA** thanked CW-1.

### *Business Operations at TASTE OF BRAZIL and THE DOG HOUSE*

107.    Records of the Massachusetts Secretary of State show that **TASTE OF BRAZIL** restaurant opened for business in Woburn, Massachusetts in 2006. From 2006 to 2016, **HUGO** was the sole registered owner and corporate officer of TUDO NA BRASA, INC. In 2016, **HUGO** dissolved the corporation and re-registered the restaurant as **TASTE OF BRAZIL–TUDU NA BRASA**, LLC, listing **HUGO** and **JESSE** as co-owners and co-managers. **TASTE OF BRAZIL** has remained open and operational since 2006 notwithstanding the corporate registration changes.

108.    **THE DOG HOUSE** restaurant was registered in Massachusetts as a limited liability company in 2016 with HUGO as its sole owner. **THE DOG HOUSE** opened for business in Woburn in 2019.

109.    Both **TASTE OF BRAZIL** and **THE DOG HOUSE** operate web pages and utilize social media accounts on Instagram and Facebook to provide information and advertising for the RESTAURANTS. These online accounts are publicly accessible and are updated frequently with information about the RESTAURANTS' menus, operating hours, and advertised specials.  Agents

and investigators working on this investigation have recently observed customers going into both restaurants and therefore believe both are still in business.

110.    According to CW-2, **JESSE** is physically present at **TASTE OF BRAZIL** every day and often does not leave the restaurant until 1-1:30 a.m. After **JESSE** closes **TASTE OF BRAZIL**, CW-2 advised that he walks over to **THE DOG HOUSE** to help **HUGO** close that restaurant. According to CW-2, **HUGO** typically does not leave **THE DOG HOUSE** until 3-3:30 a.m. CW-2 stated that **HUGO** was not present at **THE DOG HOUSE** when CW-2 was cleaning each morning from approximately 5:30 to 7:30 a.m. and that **HUGO** gave CW-2 a key to the restaurant so they could enter the building to clean.  CW-2 last worked for **JESSE** and **HUGO** in approximately 2020.

111.    In 2015, the U.S. Department of Labor, Wage and Hour Division, conducted an investigation of **TUDA NA BRASA**, **HUGO** Moraes, President, for violations of the Fair Labor Standards Act for paying employees wages below the minimum wage.  This investigation covered the period April 28, 2013 to April 25, 2015.  **HUGO** agreed to pay, and did pay, back wages of $44,208.87 as a result of this investigation.  I believe, based on my training and experience and work on this investigation, that a least a portion of the substandard wages at issue in this investigation involved employees that **HUGO** and **JESSE** knew had entered the United States unlawfully.

112.    DOL OIG OI Special Agent Sean Roberts, who is assigned to this investigation, obtained and reviewed employment records for **TASTE OF BRAZIL** and **THE DOG HOUSE** for the time period 2016 to March 31, 2021 from the Massachusetts Department of Labor. After reviewing the information contained in these records, he determined that at least 50 of the **RESTAURANTS**' employees have listed Social Security numbers that are not valid or are

assigned to other persons.  CW-2 is listed on the employment records for **TASTE OF BRAZIL** under CW-2's true name and date of birth, but CW-2's listed SSN is false and CW-2 does not have valid Employment Authorization.  SA Roberts believes, based on his training and experience and work on this investigation, that each of these employees with invalid Social Security numbers was an unauthorized alien and that both **JESSE** and **HUGO** had actual knowledge of this fact.  More than ten such employees appear on the employment records for both **TASTE OF BRAZIL** and **THE DOG HOUSE** for 2022, from which SA Roberts believes it is probable that **JESSE** and **HUGO** knowingly hired ten or more unauthorized aliens within a twelve month period and did so with actual knowledge that these employees were unauthorized aliens.

113.    In addition, a number of these employees entered the United States unlawfully and reported to CBP and/or ERO that they were from Brazil.  SA Roberts believes, based on his training and experience and work on this investigation, that these employees had been smuggled into the United States by **CHELBE**, and both **JESSE** and **HUGO** had actual knowledge of this fact when they hired them.

114.    I am aware that **JESSE** and **HUGO** have a legal obligation to maintain records on each of their employees at **THE RESTAURANTS**, and I believe these records will be found in a search of **THE RESTAURANTS** and will help prove the Target Offenses.

*Use of Phones to be Searched*

115.    As discussed above, **CAROLINE** has used her phone **781-608-5201** to exchange text messages with CW-1.  She also used this phone number when registering herself as an alternate subscriber for the YMAX account for 781-451-7505 and used **781-608-5201** when purchasing American Airlines tickets for two migrants from Brazil who entered the United States unlawfully.  She also used this number when wiring money to **CHELBE** in Brazil and to

Romulo in Mexico.  This number was also given by **CAROLINE** in her U.S. Citizenship and Immigration Service (CIS) filings.  Records recently obtained from AT&T show that **781-608-5201** is still in use and subscribed to by **CAROLINE** Caroline Photography, 10 Poole St, Woburn, MA 01801, Contact Name: Caroline Parlee, which is **CAROLINE**'s photography business.

116.    As discussed above, **JANAINA** has used her phone **781-640-3632** to speak with detained Brazilian migrant Nilson Pimintel and provide him fake U.S. point of contact information.  She also used **781-640-3632** in connection with wire transfers to De Moura in Brazil.  She also used this phone to text CW-1 to try to collect money for her father.  This phone number was recently used by **JANAINA** in connection with her U.S. Citizenship and Immigration Service (CIS) filings.  Records recently obtained from AT&T show that **781-640-3632** is still in use and subscribed to by **CAROLINE** Caroline Photography.

117.    Toll records show **JESSE**'s phone **781-879-0068** has been in contact with the YMAX account associated with the number 781-451-7505.  A combination of pen register and toll record data shows that **781-879-0068** has been in contact with Eberson Vanz, who has worked at both **TASTE OF BRAZIL** and **THE DOG HOUSE** and is an unauthorized migrant without work authorization.  The investigation has shown that Vanz has assisted the conspiracy by picking up smuggled migrants at the airport in Boston and by allowing his bank account to be used to deposit the proceeds of smuggling debts.  Toll and pen register data also show that **JESSE** has used **781-879-0068** in connection with calls with: Graziela Dutra and her daughter, both of whom were smuggled into the United States by **CHELBE**, Graziela having worked at **TASTE OF BRAZIL**; Paulo Dutra, Graziela's brother, who also was smuggled into the United States by **CHELBE**; **CAROLINE**; **JANAINA**; Anaclediene Soares, a migrant who was

smuggled into the United States by **CHELBE** and has worked at **TASTE OF BRAZIL;** and CW-2.  Records recently obtained from Verizon show that **781-879-0068** is still in use and subscribed to by **JESSE**.

118.     Toll records and pen register data show that **HUGO** has used his phone **781-858-4830** on numerous occasions to call Eberson Vanz.  Toll and pen register data also show that **HUGO** has used **781-858-4830** in connection with calls with: Graziela Dutra; CW-2 and their child SOI-1; **CAROLINE**; **JANAINA**; an individual named Lucas De Oliveira Marthos, a name that matches that of an individual who reentered the United States after deportation to Brazil and lives at a property that is owned by **HUGO**'s wife; and an individual named Anaclediene Soares, who, records show, was smuggled into the United States from Brazil in 2016 and, according to wage records, has been an employee of **TASTE OF BRAZIL**.  Toll records show that this phone number of **HUGO**'s has also been in contact with the YMAX account associated with the number 781-451-7505.  In addition, toll and pen register records show that **HUGO** has used **781-858-4830** to call ADP.  ADP call log records reflect calls from **HUGO** to ADP to provide information about employees, without listing the particular phone used.  I believe, based on my training and experience and work on this investigation, that in at least some of these calls to ADP, **HUGO** has used **781-858-4830** to provide false social security numbers for migrant employees that were smuggled into the United States by **CHELBE**.  I believe, on the same basis, that the above information, together with all the other information in this affidavit, provides probable cause to believe that a search of these phones of **JESSE**, **HUGO**, **CAROLINE** and **JANAINA** will produce evidence of violations of the Target Offenses.

## SEIZURE OF COMPUTER EQUIPMENT AND DATA

119.    As described above and in Attachment B, this application seeks permission to search for records that might be found at the RESTAURANTS, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

120.    From my training, experience, and information provided to me by other agents, I am aware that businesses frequently use computers to carry out, communicate about, and store records about their business operations. These tasks are frequently accomplished through sending and receiving business-related email and instant messages; drafting other business documents such as spreadsheets and presentations; scheduling business activities; keeping a calendar of business and other activities; arranging for business travel; storing pictures related to business activities; purchasing and selling inventory and supplies online; researching online; and accessing banking, financial, investment, utility, and other accounts concerning the movement and payment of money online.

121.    Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence that reveals or suggests who possessed or used the device.

122.    Additionally, both **TASTE OF BRAZIL** and **THE DOG HOUSE** maintain a website, Facebook page, Instagram account, and one or more email accounts associated with the RESTAURANTS (e.g., info@thedoghousewoburn.com and 434mainstreet@gmail.com). From my training, experience, and information provided to me by other agents, I am aware that websites, Facebook pages, Instagram accounts, and email accounts are typically accessed, updated, and maintained through the use of computers or cell phones. The **RESTAURANTS**' websites, Facebook pages, and Instagram accounts feature photos of the **RESTAURANTS**, contact information, menus, and links for users to engage with the **RESTAURANTS**' accounts. Records of photos and other information uploaded to and downloaded from websites or social media accounts are typically stored on computers and cell phones, as are communications transmitted via email and social media messaging accounts. Such records could provide relevant information about the **RESTAURANTS**' business operations, including communications from smuggled individuals seeking employment at the restaurant transmitted via the **RESTAURANTS**' websites, social media accounts, and email accounts.

123.    From my training, experience, and information provided to me by other agents, I am aware that businesses and individuals commonly store records of the type described in Attachment B in computer hardware, computer software, smartphones and storage media. Furthermore, smartphones can be operated as mobile recording keeping devices and can be used to keep detailed calendars, work schedules, take photos of work performed, used to send communications with clients and employees through text messages. These records would be instrumental in identifying communications about employment for individuals who are being and have been smuggled into the United States, as well as identifying records of smuggling debts and cash payments.

124.    Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally over the Internet. This is true because:

    a.  Electronic files downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers or cell phones, they can easily transfer the data from their old computer or cell phone to their new one.

    b.  Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

    d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often

maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.  Based on actual inspection of other evidence related to this investigation, including loan applications, wage reports, and payroll records, I am aware that computer equipment was used to generate and submit documents used in the smuggling scheme. Further, based on interviews with current and former employees, there is reason to believe that there are computer systems currently located at and used by both RESTAURANTS.

f.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

g.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where,

and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (*e.g.*, registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically

also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

h.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

i.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore,

contextual information necessary to understand other evidence also falls within the scope of the warrant.

j.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

125.   Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of the following:

a.   The volume of evidence. Storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b. Technical requirements. analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files.  Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.  Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

126.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

127.   The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B because they are associated with (that is used by or belong to) **THE RESTAURANTS, CHELBE, JESSE**,

**HUGO**, **CAROLINE, or JANAINA**. If, however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

128.    In this case, I recognize that **TASTE OF BRAZIL** and **THE DOG HOUSE** are functioning restaurants that conduct legitimate business, and that seizing computer equipment may limit the **RESTAURANTS**' ability to conduct its legitimate business.

a.    As stated above, there are a variety of reasons why law enforcement agents might need to seize the computer equipment for subsequent processing elsewhere.  If the **RESTAURANTS** require access to data that is not contraband or evidence of a crime, the government will work with the **RESTAURANTS** after the search to copy this data onto storage media provided by the company for the **RESTAURANTS**' use.

b.    If the search team determines that there is no reason to seize certain of **RESTAURANTS**' computer equipment during the execution of this warrant, the team will create an onsite electronic "image" of those parts that are likely to store data specified in the warrant, if imaging is practical. Generally speaking, imaging is the taking of a complete electronic picture of the data, including all hidden sectors and deleted files. Imaging permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer equipment. However, imaging at the premises can often be impractical, because imaging is resource-intensive: it can take hours or days, thus requiring law enforcement agents to remain at the premises for much longer than their would remain if their seized the items, and it can require personnel with specialized experience and specialized equipment,

both of which might be unavailable  If law enforcement personnel do create an image at the premises, their will then search for the records and data specified in the warrant from the image copy at a later date off-site.

129.    This warrant authorizes a review of computer equipment, electronic storage media, electronic communications, and mobile phones seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, HSI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## UNLOCKING A DEVICE USING BIOMETRIC FEATURES

130.    I know from my training and experience, as well as from information found in publicly available materials, that some models of cell phones made by Apple and other manufacturers offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

131.    On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID. If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in

8 hours <u>and</u> the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

132.     The passcode that would unlock the devices permitted to be seized pursuant to this warrant is not currently known to law enforcement. Thus, it may be useful to press the finger(s) of the user(s) of the device(s) found during the search of the **RESTAURANTS** or of the persons or residences of **CHELBE, JESSE**, **HUGO**, **CAROLINE, and JANAINA** to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

133.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require any occupant of the **RESTAURANTS** to press their

finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

134.     For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the **RESTAURANTS** to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

## <u>NEED TO EXECUTE BEFORE 6:00 AM</u>

135.     On Saturday, October 1, 2022, agents assigned to this investigation received information from a law enforcement officer who had spoken to **JESSE** that **JESSE** was planning on traveling to Brazil on October 3 or 4 for two weeks.  HSI was able to determine that **JESSE** has a reservation on a flight from Boston to Brazil on October 4, 2022, at 9:24 am.  I believe, based on my training and experience and work on this investigation, that there is a real risk that **JESSE** might remain in Brazil indefinitely and that, if he were to learn of this investigation, he might not return to the United States.  I know that **JESSE** is a U.S. citizen, but I do not know whether he maintains citizenship in Brazil.  I have been informed that Brazil will not extradite its citizens. Therefore, I believe it is imperative to execute the warrant on **JESSE**'s person before he leaves for Brazil.  Given that he has an international flight, I believe **JESSE** might leave for the airport before 6:00 am.  I also believe that once any warrant is executed in this investigation, there is a strong likelihood that other Target Subjects will be notified and could flee or destroy evidence. Therefore, I believe it is important that each of these warrants be executed simultaneously. Therefore, I request authority to execute these warrants earlier than 6:00 am on October 4, 2022.

## CONCLUSION

136.    Based on the information described above, I have probable cause to believe that

**CHELBE** WILLAMS MORAES, **JESSE** JAMES MORAES, **HUGO** GIOVANNI MORAES,

**CAROLINE** LOREDANNA DE MORAES PARLEE, and **JANAINA** DE MORAES

GUALBERTO have violated 8 U.S.C. §§ 1324(a)(1)(A)(i) and (B)(1); 1324(a)(1)(A)(iv) and

(B)(1); 1324(a)(1)(A)(v)(I) and (B)(i); and 1324(a)(3)(A); and 18 U.S.C. §§ 1956(a)(1)(B)(i);

1956(a)(2)(A); and 1956(h).

137.    Based on the information described above, I also have probable cause to believe

that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are

contained on and within the persons and premises described in Attachment A.


Respectfully submitted,

_James Michael Staton_
_____
JAMES MICHAEL STATON
Special Agent, United States Department of
Homeland Security, Immigration and Customs
Enforcement, Homeland Security
Investigations


Subscribed and sworn to by telephone on October_____3_____, 2022.

5:51 p.m.

_David H. Hennessy_
_____
HON. DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE

70

## ATTACHMENT A-1

### Premises, Property and Persons to be Searched

The premises, property, and persons to be searched are:

**TASTE OF BRAZIL—TUDO NA BRASA**, LLC, 414 Main Street, Woburn, MA, further described as a restaurant occupying primarily the first-floor corner unit of a two-story brick building adjacent to Andrea's Pizza. There is a single door at the main entrance of the restaurant with large, black trim windows on either side of the doorway facing Main Street. A sign above the entryway reads "Tudo Na Brasa."  The premises to be searched consists of a main floor and a lower floor which includes a kitchen and an office.



## <u>ATTACHMENT A-2</u>

### Premises, Property and Persons to be Searched

The premises, property, and persons to be searched are:

**THE DOG HOUSE** BAR & GRILL, LLC, 434 Main Street, Woburn, MA, further described as a restaurant occupying primarily the first-floor of a three-story building. The first-floor exterior facade is gray stone with black trim while the second and third floors are gray shingles. The main entrance to the restaurant is indicated by a set of double doors above which the street number "434" is visible as well as signage reading "Dog House Bar & Grill" On either side of the doorway is a large picture window with black awning. There is a single door entrance to 432 Main Street in the front left corner of the building adjacent to Toppers Hair Salon.   The premises to be searched consists of a main floor and an upper floor including an office.



## ATTACHMENT A-3

### Premises, Property and Persons to be Searched

The person and property to be searched are:

Target Subject **JESSE** JAMES MORAES (DOB 01/13/1958) (SSN 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) (Alien Number 087027760), his cellular telephone (781-879-0068), and any bags or items in his custody or control.

Target Subject **JESSE** lives at 432 Main Street, Unit 304, Woburn, MA, and is further described as a white male, approximately 64 years old, 5'7" tall and bald with brown eyes. Target Subject **JESSE** is depicted below:



Target Subject **JESSE**'s cellular telephone is further described as a Samsung Galaxy Note 10+ with IMEI: 356628100774510 and phone number: 781-879-0068.

## <u>ATTACHMENT A-4</u>

### Premises, Property and Persons to be Searched

The person and property to be searched are:

Target Subject **HUGO** GIOVANNI MORAES (DOB 10/22/1979) (SSN 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), (Alien Number 096406193), his cellular telephone (781-858-4830), and any bags or items in his custody or control.

Target Subject **HUGO** lives at 10 Frederick Drive, Woburn, MA and is further described as a white male, approximately 42 years old, 5'7" tall, weighing approximately 155 pounds, with brown hair and green eyes. Target Subject **HUGO** is depicted below:



Target Subject **HUGO**'s cellular telephone is further described as an Apple iPhone 12 Pro with IMEI: 356681110291868 and phone number: 781-858-4830.

## ATTACHMENT A-5

### Premises, Property and Persons to be Searched

The person and property to be searched are:

Target Subject **CAROLINE** DE MORAES PARLEE (DOB 10/5/1988) (Alien Number 219068871), her cellular telephone (781-608-5201), and any bags or items in her custody or control.

Target Subject **CAROLINE** lives at 111 Salem Street, Unit 1, Woburn, MA, and is further described as a white female, approximately 33 years old, 5'8" tall, weighing approximately 163 pounds, with blond hair and brown eyes. Target Subject **CAROLINE** is depicted below:



Target Subject **CAROLINE**'s cellular telephone is further described as an Apple iPhone 14 Pro with IMEI: 3530391138226317 and phone number: 781-608-5201.

**ATTACHMENT A-6**

**Premises, Property and Persons to be Searched**

The person and property to be searched are:

Target Subject **JANAINA** DE MORAES GUALBERTO (DOB 04/09/1994) (Alien Number 205035475), her cellular telephone (781-640-3632), and any bags or items in her custody or control.

Target Subject **JANAINA** lives at 39 Bruno Terrace, Woburn, MA, and is further described as a white female, approximately 28 years old, 5'7" tall, weighing approximately 132 pounds, with brown hair and brown eyes. Target Subject **JANAINA** is depicted below:



Target Subject **JANAINA**'s cellular telephone is further described as an Apple iPhone 13 with IMEI: 3554029328328210 and phone number: 781-640-3632.

76

## ATTACHMENT B

### Property to be Seized

1.    All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 8 U.S.C. §§ 1324(a)(1)(A)(i) and (B)(1); 1324(a)(1)(A)(iv) and (B)(1); 1324(a)(1)(A)(v)(I) and (B)(i); and 1324(a)(3)(A); and 18 U.S.C. §§ 1956(a)(1)(B)(i); 1956(a)(2)(A); and 1956(h), including:

A.    Records and tangible objects pertaining to the following people, entities, physical addresses, telephone numbers, e-mail addresses, websites, and social media accounts:

    1.    **CHELBE** WILLIAMS MORAES (DOB 05/16/1961)

    2.    Phone number +55 31 9727 3586

    3.    **JESSE** JAMES MORAES (DOB 01/13/1958)

    4.    Phone number 781-879-0068

    5.    **HUGO** GIOVANNI MORAES (DOB 10/22/1979)

    6.    Phone number 781-858-4830

    7.    **CAROLINE** DE MORAES PARLEE (DOB 10/05/1988)

    8.    Phone number 781-608-5201

    9.    **JANAINA** DE MORAES GUALBERTO (DOB  04/09/1994)

    10.    Phone number 781-640-3632

    11.    **TASTE OF BRAZIL**—TUDO NA BRASA, LLC, 414 Main Street, Woburn, MA

    12.    **THE DOG HOUSE** BAR & GRILL, LLC, 434 Main Street, Woburn, MA

    13.    37 Center Street, Woburn, MA

14.     hugogmbrazil@gmail.com

15.     hugo@thedoghousewoburn.com

16.     434mainstreet@gmail.com

17.     loredanna_18@msn.com

18.     carolinemoraesbh@hotmail.com

19.     Website, Facebook, and Instagram accounts for **THE DOG HOUSE**

20.     Website, Facebook, and Instagram accounts for **TASTE OF BRAZIL**

B.     Records and tangible objects pertaining to the following topics:

1.     Identification of employees of the **RESTAURANTS**, such as a list of employees and job duties, employees' names, aliases, addresses, phone numbers, dates of birth, social security numbers and taxpayer identification numbers, identification documents, and applications and employment contracts.

2.     Employees' immigration and work authorization/verification, such as copies of identification documents provided by or on behalf of employees, documents executed by employees and **RESTAURANTS'** supervisors or managers, documents submitted to federal, state and local authorities, and communications.

3.     The **RESTAURANTS**' payroll and scheduling records, such as employees' shift schedules, assigned jobs, time cards, records of hours worked, records of payment in any form *(i.e.*, check, cash, debit card, in-kind, satisfaction of debt, etc.), documents submitted to federal, state, and local authorities, and communications.

78

C.     Records and tangible objects pertaining to the payment, receipt, transfer, or storage of money or other things of value by or to any one of the names listed above, including, without limitation:

    1.     Bank, credit union, investment, money transfer, and other financial accounts;

    2.     Credit and debit card accounts;

    3.     Tax statements and returns;

    4.     Business or personal expenses;

    5.     Income, whether from wages or investments; and

    6.     Loans.

D.     Records and tangible objects pertaining to the travel or whereabouts of **CHELBE** WILLIAMS MORAES, **JESSE** JAMES MORAES, **HUGO** GIOVANNI MORAES, **CAROLINE** DE MORAES PARLEE, and **JANAINA** DE MORAES GUALBERTO between May 1, 2016 and the present;

E.     Records and tangible objects pertaining to the existence, identity, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

F.     For any computer hardware, computer software, mobile phones, or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

    1.     evidence of who used, owned, or controlled the computer equipment;

    2.     evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of

security software designed to detect malicious software;

3.      evidence of the attachment of other computer hardware or storage media;

4.      evidence of counter-forensic programs and associated data that are designed to eliminate data;

5.      evidence of when the computer equipment was used;

6.      passwords, encryption keys, and other access devices that may be necessary to access the computer equipment; and

7.      records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage.

G.      Records and tangible objects relating to the ownership, occupancy, or use of the premises to be searched (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers).

2.      All computer hardware, computer software, and storage media. Off-site searching of these items shall be limited to searching for the items described in paragraph 1.

3.      During the execution of the search of the Subject Premises and Target Subjects described in Attachments A-1, A-2, A-3, A-4, A-5, and A-6, law enforcement personnel are authorized to press the fingers (including thumbs) of **JESSE** JAMES MORAES, **HUGO** GIOVANNI MORAES, **CAROLINE** DE MORAES PARLEE, **JANAINA** DE MORAES GUALBERTO, and individuals found at the Subject Premises to the sensor of the subject device and/or to hold the device in front of their faces.

## DEFINITIONS

For the purpose of this warrant:

H.     "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

I.     "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

J.     "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

K.     "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

L.     "Data" means all information stored on storage media of any form in any storage format and for any purpose.

M.     "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

**RETURN OF SEIZED COMPUTER EQUIPMENT**

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.